MINER, Circuit Judge.
Plaintiffs-appellants, members of a class of present and former professional models, and their counsel appeal from two orders entered in the United States District Court for the Southern District of New York (Baer, J.) approving settlements and awarding attorneys’ fees in a class action brought against defendant modeling agencies for conspiracy to fix commissions charged to members of plaintiff class, in violation of the Sherman Act. Also before us are appeals from an order denying reconsideration of those orders and an order allocating the proceeds of settlement with a bankrupt defendant. The appellants contend that the District Court erred in (1) ordering the distribution of settlement proceeds in excess of recognized losses to various charities rather than to the class members as treble damages and prejudgment interest; (2) allocating the funds derived from the estate of a bankrupt defendant without additional notice to the class; and (3) applying the wrong standard in awarding counsel fees, with the result that the fee allowance to counsel for plaintiffs-appellants is inadequate.
*426 For the reasons that follow, we vacate the orders appealed from insofar as they relate to the distribution of settlement proceeds and the award of counsel fees and remand the case to the District Court for reconsideration of those matters; and we affirm the orders in all other respects.
BACKGROUND
A. Litigation and Settlement
In 2001 plaintiffs’ counsel[1] began to investigate various business practices in the modeling agency industry. Through this investigation, plaintiffs’ counsel purportedly developed evidence that the leading New York modeling agencies, acting in concert since the mid-1970s, (1) falsely claimed exemption from the 10% commission rate cap imposed on “employment agencies” under Article 11 of the New York General Business Law by asserting that they were “managers” and only incidentally involved in procuring employment for their models, and (2) raised the “standard rate” of model commissions from 10% to 20%, where it has stayed since the late 1980s. No government agency participated in the investigation or the ensuing litigation.
The plaintiffs filed their first complaint alleging violation of Section 1 of the Sherman Act, New York General Business Law Article 11, and New York common law on June 25, 2002. The plaintiffs alleged that the defendants conspired to uniformly charge models a commission of 20% — exceeding the 10% maximum allowed by New York law for employment agencies' — • and that the defendants used their trade association, Model Management Corporation CFk/a “International Model Managers Association”), to advance their collusive scheme. This action eventually was consolidated with four similar actions. On September 24, 2002, the plaintiffs filed their First Consolidated Amended Complaint. On November 15, 2002, the District Court determined that it would address class certification before permitting discovery on the merits. The District Court referred discovery matters relating to class certification to Magistrate Judge Henry B. Pitman.
Responding to various motions to dismiss the complaint, the District Court, by opinion and order dated January 16, 2003, declined to exercise jurisdiction over the state law claims, denied the motion to dismiss as to the claims of price-fixing under the Sherman Act within the period allowed by the four-year statute of limitation, and gave leave to re-plead the tolling of claims arising prior to June 25, 1998. Masters v. Wilhelmina Model Agency, Inc., No. 02 Civ. 4911, 2003 WL 145556 (S.D.N.Y. Jan. 17, 2003). In a later order, the District Court dismissed claims accruing prior to June 25, 1998 as barred by the statute of limitations. Masters v. Wilhelmina Model Agency, Inc., No. 02 Civ. 4911, 2003 WL 1990262 (S.D.N.Y. Apr. 29, 2003).
A Second Consolidated Amended Complaint was filed on February 5, 2003 and a third on April 30, 2003. The District Court granted the motion for class certification on July 15, 2003, certifying a plaintiff class consisting of current and former models who had oral or written contracts with any of the defendants from June 1998 onward. Fears v. Wilhelmina Model Agency, Inc., No. 02 Civ. 4911, 2003 WL 21659373 (S.D.N.Y. July 15, 2003). Appellant, Boies, Schiller & Flexner LLP (“Appellant” or “Boies Schiller”), was approved as lead class counsel. Id. at *7. Thereafter, defendant-appellee Next petitioned this Court for interlocutory review of the *427 District Court’s July 15 Class Certification Order. The petition was denied on December 31, 2003.
The District Court then permitted discovery on the merits to proceed, again with Magistrate Judge Pitman supervising the process. The discovery process was a long and difficult one, marked by delay and resistance. During the process, Magistrate Judge Pitman admonished both sides and twice sanctioned plaintiffs’ attorneys for their discovery practices. In the course of discovery, the plaintiffs identified, obtained, inspected and analyzed more than 32,000 pages of documents produced by the defendants and nonparties. There were 25 formal conferences, as well as several informal conferences, before Magistrate Judge Pitman during merits discovery. These conferences were required in order to resolve disputes relating to interrogatories, document production, and depositions. Toward the end of the discovery process, Magistrate Judge Pit-man imposed a $25,000 sanction against plaintiffs’ attorneys and ordered them to exclude certain of their time from their fee petition as a further sanction.
At the conclusion of merits discovery, motions by defendants for summary judgment were filed and the submissions were voluminous. On March 22, 2004, the District Court denied summary judgment as to all but defendant Q Model Management on plaintiffs’ price-fixing claims. Fears v. Wilhelmina Model Agency, Inc., No. 02 Civ. 4911, 2004 WL 594396 (S.D.N.Y. Mar. 23, 2004). The Court determined that Q Model Management was founded long after the formation of the alleged conspiracy and never held membership in the trade association. With regard to the other defendants, the District Court determined that plaintiffs’ evidence would support a jury finding that the modeling agency business was an industry “inundated with collusion.” Id. at * 13.
Settlement negotiations began with certain defendants only after the court denied defendants’ motions for summary judgment and were heavily influenced by the real prospect of the defendants’ bankruptcy. From late March 2004 until the scheduled trial date of June 1, 2004, the plaintiffs reached preliminary settlements with all defendants except for Click. These preliminary settlements took the form of letter agreements (the “Letter Agreements”) signed in or about May of 2004 by the attorneys for each of the settling defendants and the class attorneys. The Letter Agreements outlined the settlement terms, including the amount of each defendant’s contribution and the manner of payment. Each of these agreements included the following provision:
11. This is a binding agreement. Any future disagreement(s) as to the form or content of the formal settlement agreement and final judgment, and/or any other ancillary papers, will be resolved by the Honorable Harold Baer, Jr., without right of appeal.
Jury selection for the trial against Click commenced on June 1, 2004, and opening statements were delivered on June 3, 2004. The plaintiffs presented lay witnesses during the first day of trial, including two of the class representatives, Carolyn Fears and Tiffany Connor. On June 3, 2004, the plaintiffs reached a settlement with Click, and the jury was dismissed. The parties thereafter proceeded to negotiate a formal Settlement Agreement to be presented to the District Court for approval. A sticking point in the negotiations was the disposition of unclaimed or unpaid funds (the “Excess Funds”) that might remain after payment to the class members of their actual losses. Appellants accused defendant Next of a last-minute repudiation of *428 the settlement for failure to provide for the reversion of Excess Funds. Next denies that its repudiation was “last minute,” contending that its counsel had notified all other counsel in the case three months before the Settlement Agreement was signed that his client was not “on board” with regard to the proposed disposition of Excess Funds.
In any event, the Final Settlement Agreement (the “Agreement”) was signed on October 12, 2004 with (i) Boss Models, Inc.; (ii) Click Model Management, Inc.; (iii) DNA Model Management, LLC; (iv) Ford Models, Inc.; (v) Gerard W. Ford; (vi) Images Management; (vii) IMG Models, Inc.; (viii) IMG Worldwide, Inc.; (ix) Next Management Co.; and (x) Wilhelmina International, Ltd.; and (xi) Zoli Management, Inc. The Agreement created a settlement fund in excess of $21,855,000, which was to be distributed pro rata to class members based on the amount of commissions paid by each member in excess of 10%, plus interest.
As to distribution of the settlement fund, paragraph D.2 of the Agreement specifically provided:
(b) Every Authorized Claimant shall be paid from the Net Settlement Fund a portion of his or her “Total Recognized Loss,” which shall be calculated as follows:
(1)An Authorized Claimant’s “Recognized Loss” for any transaction on which he or she paid a commission to a defendant during the Relevant Period shall be the difference, if any, between (A) the commission that the Authorized Claimant paid to the defendant and (B) ten percent of the amount of the transaction. There shall be no Recognized Loss for any transaction on which the Authorized Claimant paid no commission, or for any transaction on which the Authorized Claimant paid a commission of ten percent or less.
(2) An Authorized Claimant’s “Total Recognized Loss” shall be the sum of all of his or her Recognized Losses.
(3) If the sum of the Total Recognized Losses of all Authorized Claimants who submit valid and timely proof of claim forms is equal to or greater than the amount of the Net Settlement Fund, then the net settlement fund shall be distributed to all authorized claimants on a pro rata basis....
(4) If the sum of the Total Recognized Losses of all Authorized Claimants who submit valid and timely proof of claim forms is less than the amount of the Net Settlement Fund, then the Court shall, in its discretion, determine the disposition of the amount representing the difference between the two figures, after hearing the views of the parties hereto as to such disposition.
As to awards to counsel and certain representative plaintiffs, the agreement provided:
E.l Plaintiffs’ Settlement Counsel may submit an application or applications (the “Fee and Expense Application”) for distributions from the Settlement Fund for: (a) an award of attorneys’ fees; plus (b) reimbursement of expenses incurred in connection with prosecuting the Action; (c) plus any interest on such attorneys’ fees and expenses at the same rate and for the same periods as earned by the Settlement Fund (until paid) as may be awarded by the Court; and (d) for incentive awards and reimbursement of expenses to certain Representative Plaintiffs in prosecuting the Action. Plaintiffs’ Settlement *429 Counsel reserve the right to make additional applications for fees and expenses incurred. However, fees or expenses of Plaintiffs’ Counsel may be paid from the Settlement Fund only after the Final Settlement Date occurs for a Settling Defendant from whose settlement payments such fees or expenses will be paid.
E.2 The portion of the Fee and Expense Award attributable to any Settling Defendant shall be paid to Plaintiffs’ Settlement Counsel from the Settlement Fund, as ordered, after the Final Settlement Date for such Settling Defendant, and after the Court executes a written order awarding such fees and expenses, notwithstanding the existence of any timely filed objections thereto, or potential appeal therefrom, subject to the joint and several obligation of Plaintiffs’ Settlement Counsel to make appropriate refund repayments to the Settlement Fund as more particularly set forth below in [paragraph] E.3. Plaintiffs’ Settlement Counsel shall thereafter allocate the attorneys’ fees amongst Plaintiffs’ Counsel in a manner in which Plaintiffs’ Settlement Counsel in good faith believe reflects the contributions of such counsel to the prosecution and settlement of the Action.
The Agreement also provided for a number of injunctive provisions that were designed to address and end certain practices which disadvantaged models prior to the commencement of the litigation. Such provisions included disclosure by Settling Defendants of all bookings and compensation received for each model, utilization of contracts with models specifying relevant compensation terms and practices and management services, and a prohibition against joining any model agencies’ or managers’ trade associations in the United States.
B. Approval of the Settlement
A motion for preliminary approval of the settlement proposed in the Agreement and for authorization to disseminate notice and claims forms was granted by the District Court by Order dated October 12, 2004. By that Order, the District Court found “that the proposed settlements with the Settling Defendants set forth in the Settlement Agreement, subject to final determination following a hearing after notice to the Class, is sufficiently fair, reasonable and adequate to authorize dissemination of the notice.” The Order specified the form and manner of service of the notice and cut-off dates for filing objections to the Settlement, exclusion from the Class, and papers in support of the Settlement. It fixed December 20, 2004 for a hearing to determine whether the Settlement should be approved and whether the motion of plaintiffs’ counsel for an award of attorneys’ fees and expenses and for payments to certain representative plaintiffs should be granted.
By affidavit dated December 9, 2004, the Claims Administrator appointed by the Court reported that 16,512 notices had been mailed to potential class members by first-class mail and that a summary notice of the proposed settlement had been published in USA Today on October 25, 2004. The notice advised that the deadline for filing proofs of claim had been fixed at January 6, 2005. By Opinion and Order dated May 5, 2005, the District Court granted in part and denied in part the motion originally filed by plaintiffs on December 13, 2004 for approval of the final proposed settlement, including incentive awards and distributions to claimants, attorneys’ fees and expenses and distribution of residual funds. Fears v. Wilhelmina Model Agency, Inc., No. 02 Civ. 4911, 2005 WL 1041134 (S.D.N.Y. May 5, 2005).
*430 C. Opinion and Order Approving Settlement and Directing Distribution
With respect to the terms of settlement, the Court reviewed the provisions of the Settlement Agreement providing for the creation of a $21,855,000 Settlement Fund and injunctive and equitable relief. The Court observed that “[t]he non-monetary portion of the Agreement may prove more valuable to the models than the monetary settlement and should not be overlooked in any analysis of the success of this lawsuit.” Id. at * 1. In approving the settlement as reasonable, the Court found as follows:
This case involves an alleged price-fixing scheme in the modeling industry by some of the industrfy’s] most powerful agencies. The issues were thoroughly investigated and aggressively litigated. Plaintiffs’ success was never assured and, if the case had continued, plaintiffs would have had to prove a complex conspiracy to artificially fix the commission structure in the modeling industry. See, e.g., In re Visa Check/Mastermoney Antitrust Litig., 297 F.Supp.2d 503, 511 (E.D.N.Y.2003) (“The complexity of federal antitrust law is well known”). Settlement negotiations were conducted over months, at arm’s length, and between experienced and skilled attorneys with frequent pretrial conferences and motion practice.
Based on all these findings, the Agreement is reasonable.
Id. at *3.
Included in the settlement approval were incentive awards in the sum of $25,000 for each of the two named plaintiffs who were deposed and $15,000 for each of the two trial witnesses and eight class representatives. Id. The Court noted that incentive awards were related to the individual’s personal risk and additional efforts to benefit the lawsuit. Id. The District Court conditioned its overall settlement approval upon the maintenance of a database by the Claims Administrator. Id. at *2. The Court noted that the Claims Administrator had incurred $25,000 in expenses to the date of the Opinion and Order and had “estimated an additional $50,000 to $75,000 in reimbursable fees and expenses related to the distribution of funds, tracking the issuance and deposits of checks to class members, and preparation of interim and final reports.” Id. at *3.
In its decision, the District Court noted that defendant Elite had filed a Chapter 11 Petition in the Bankruptcy Court for the Southern District of New York on February 11, 2004; that pursuant to the Bankruptcy Organization Plan, the model representative would be deemed to have an unsecured claim of $2,575,000; and that, based upon an estimated distribution, it was anticipated that the model representative would receive a cash distribution on the allowed model claims of between $847,000 and $1,673,750. Id. at *1 n. 3. The total Settlement Fund of $21,855,000 would be increased by the bankruptcy settlement, which provided that the settlement proceeds be held in escrow pending the entry of an “allocation order” by the District Court. Id. The Bankruptcy Court Order approved the proposed settlement with Elite as “fair, reasonable and in the best interest of the Debtor’s estate and creditors.” Id. That Order included the following provision:
To the extent the Allocation Order directs that all or a portion of the Model Distribution be distributed (a) to charity or (b) to holders of any Class 4 Claim other than claim No. 50 filed on behalf of the class of plaintiffs in the Fears Action (the “Individual Model Claims”), that portion of the Model Distribution (the “Excess Distribution ”) shall be redistributed to the Plan Administrator for *431 a pro rata distribution to the holders of Individual Model Claims to the extent they are Allowed Class 4 Claims in the Bankruptcy Case.... Upon payment in full of all Allowed Individual Model Claims, any remaining Excess Distribution shall be distributed on a pro rata basis to certain other creditors and in accordance with the distribution priorities set forth in the Plan approved by the Bankruptcy Court.
Accordingly, the District Court concluded that while it was required to allocate the proceeds of the Elite settlement among the plaintiffs in this action, “review of the substantive fairness of the settlement between plaintiffs and [Elite] is unnecessary” in view of the Bankruptcy Court Settlement Order. Fears, 2005 WL 1041134, at *1 n. 3. The District Court observed that it was empowered by the Elite Reorganization Plan to “approve and direct the allocation of the proceeds” of that Settlement in this action, designated the Fears action. Id.
Turning to the question of attorneys’ fees, the District Court recognized the claim of plaintiffs’ counsel to a fee award of 33.33% of the fund of $21,855,000 ($7,285,000) plus unreimbursed expenses ($1,590,164.65) for a total of $8,875,164.65. Id. at *9. The District Court also recognized that the lodestar calculation (number of hours reasonably expended times reasonable hourly rate), involving approximately 28,000 professional hours, plus the expenses claimed, totaled $10,702,324.65. Id. at *6, *9. The Court observed that the percentage fee award plus expenses requested was 40% of the total fund and that the lodestar amount alone was substantially more than the amount of the claims filed to the date of the District Court’s opinion — $9,338,958.29. Id. at *9. Evaluating the factors to be considered in fixing a reasonable common-fund fee, the District Court first addressed the time and labor expended by counsel.
In determining a reasonable attorneys’ fee, the District Court considered several factors, including (1) the time and labor expended by counsel; (2) the magnitude of the litigation; (3) the risk of litigation; and (4) the quality of representation. In examining the time and labor factor, the District Court reviewed the hours spent and rates charged by each of the law firms representing the plaintiffs in computing their lodestar claims. Because, as will be seen, the District Court ultimately resolved the fee issue by awarding fees on the basis of a percentage of “claims made,” the District Court determined that “the lodestar calculation is primarily for crosscheck purposes.” Id. at *6.
As to the magnitude of the litigation, the District Court took note of plaintiffs’ allegations that they were confronted with the need to establish a wide-ranging price-fixing conspiracy that existed over a period of thirty years and involved as defendants “some of the most venerable names in the modeling industry.” Id. at *7. As to the risk of litigation factor, the District Court referred to the numerous motions to dismiss and for summary judgment, the extensive discovery conducted, the contingent nature of the litigation, and the advancement of tens of thousands of dollars in disbursements by Class Counsel. See id. The District Court thereupon concluded that “the manner in which this case unfolded demonstrates the significant possibility that Class Counsel could have failed to achieve any recovery at all and, consequently, no compensation.” Id. at *8.
Finally, the District Court found that the quality of representation by Class Counsel in this case “appears to be satisfactory.” Id. The court further remarked that “in having brought this lawsuit, the *432 plaintiffs’ lawyers performed a valuable public service for which they are to be commended.” Id. The court, however, “tempered” this praise by referring to the conduct of the plaintiffs’ counsel during the discovery process and by imposing sanctions as a result of that conduct. Id. The court opined that “attorneys’ conduct throughout the litigation must be factored into the quality of representation analysis” and, accordingly, “reduced the sought-for-fee award to include and emphasize [its] concern on this score.” Id. at *9.
The District Court ultimately “conclude[d] that a fair and appropriate fee is 40% of the [claims made against the Settlement Fund], including [a separate] mediated settlement [in another action against IMG Models, among other defendants].” Id. at * 16. “If translated into a percentage of the entire Fund this would equal 17.2%, or $3,759,583.16.” Id. The court determined that all claimed expenses would be allowed, bringing the fees and expenses total to $5,349,747.81. Id. It also found that the estimated cost of Fund administration — $75,000-$100,000—was “within acceptable limits” and noted that the Fund might be increased by any contribution to be made by Elite. Id. at * 16 & n. 17.
In deciding to award fees on the basis of funds claimed rather than on the basis of the Settlement Fund created, the District Court recognized a split in authority, with the Supreme Court yet to weigh in on the issue. In declining to award fees on the basis of the total Fund available, the court noted that “court authorization of what can be analogized as a windfall to the attorneys would violate ... the Second Circuit’s clear intention to avoid such awards.” Id. at *4. The District Court also found support for its position in the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104-67, 109 Stat. 737 (Dec. 22, 1995) (“PSLRA”) and in the Class Action Fairness Act of 2005, Pub.L. No. 109-2, 199 Stat. 4 (Feb. 18, 2005) (“CAFA”). See id. (examining Congressional intent).
Turning to the question of distribution of the residual or unclaimed funds, the District Court noted that the Settlement Agreement conferred discretion upon the Court with regard to the disposition of such funds “after hearing the views of the parties hereto as to such disposition.” Id. at *10. According to the Court,
[m]ost Defendants ... voiced concerns about the models being awarded any more than the amount of money arrived at by the agreed upon formula for their claim and some sought to have money returned to their clients, they then went on to suggest preferred charitable contributions.

Id.

The Court determined to distribute the Excess Funds under the Cy Pres Doctrine. Id. at 17 *10-*11. The Court met with representatives of various organizations designated by the parties and others to identify charities that would directly or indirectly benefit members of the class with the least administrative costs. The District Court chose the following organizations to receive the residual funds and provided a brief description of their purposes and goals and the manner of allocation of the funds to be distributed: Beth Israel Medical Center’s Continuum Women’s Cardiac Care Network; Columbia Presbyterian Medical Center’s Eating Disorders Program; Columbia Presbyterian Medical Center’s Division on Substance Abuse; Columbia Presbyterian Medical Center’s Ovarian Cancer Repository; New York University Medical Center; Civil Division of the Legal Aid Society; and The Heart Truth. See id. at *11 — *16.
*433 D. Proceedings Following the Opinion and Order
On May 19, 2005, plaintiffs moved for reconsideration of the Opinion and Order approving the Settlement and directing distribution. “Overlooking the motion’s procedural deficiencies in the interest of deciding matters on the merits,” Fears v. Wilhelmina Model Agency, Inc., No. 02 Civ. 4911, 2005 WL 1325297, at *2 (S.D.N.Y. Jun. 6, 2005), the Court rejected the contentions of error in the Court’s decision to award single, rather than treble, damages and in its failure to award prejudgment interest. See id. at *3. The Court reasoned that the unambiguous terms of the Settlement Agreement made no provision for the distributions sought and that it was bound under the circumstances to approve or disapprove the Settlement negotiated by the parties. See id. Reviewing its decision to award counsel fees equivalent to 17.2% of the entire Fund, the Court determined that it had overlooked no decisions that might have directed a different outcome. See id.
In reaffirming the decision to distribute Excess Funds under the Cy Pres Doctrine, the Court noted that the Settlement Agreement included a specific provision allowing for the Court to distribute such funds in the exercise of its discretion. The District Court also noted that “[plaintiffs’ counsel gave at least tacit approval to the distribution scheme by proposing charitable organizations of his own.” Id. at *4. The Court denied the motion for reconsideration in all respects, except that it granted the motion to the extent of clarifying the incentive awards to class representatives. See id. at *5.
Final Judgment Orders were entered on May 6, 2005 as to defendants Click Model Management, Boss Models, DNA Model Management, Ford Models, Gerard Ford, Images Management, and IMG Models; and on May 9, 2005 as to Next Management, Zoli Management and Wilhelmina International. On July 12, 2005, a Settlement Allocation Order was entered as to defendant Elite Management. It noted that residual funds were to “be distributed to a variety of charitable organizations” and provided that “the ‘Settlement Escrow Account’ (Elite’s contribution to the Fears Settlement) shall be released to the [Elite] Plan Administrator and the Elite New York Settlement proceeds shall be available for distribution” according to the Bankruptcy Court Order.
Subsequent Court Orders authorized the Claims Administrator to begin mailing distributions to class members in accordance with their claims. The various charities designated as recipients of the Excess Funds have been advised that distribution to them must await this appeal. We have been advised of a motion pending in the District Court to allow the filing of sixty-six claims received from December 1, 2005 (the outside date for filing fixed by the District Court) through June 27, 2006. Before this Court are pending motions by plaintiffs to supplement the record with five letters sent to the District Court from counsel for plaintiffs, a renewed motion for the same relief, and a motion by defendant Next to strike a portion of the appellants’ reply brief.
ANALYSIS
I. Of the Notice of Appeal and the Issues Presented.
The Notice of Appeal filed in the District Coui’t on October 25, 2005 refers to an earlier Notice of Appeal filed on June 3, 2005 and addressed to the May 5, 2005 Order approving the settlement. It recites that the briefing schedule relating to the earlier appeal was stayed to ensure the finality of district court proceedings. It *434 further states: “The District Court entered Final Judgment Orders dismissing plaintiffs’ claims against the two remaining defendants [Elite Model Management, Inc. and Model Management Corporation] on September 29, 2005. Therefore, Final Judgments have been entered on all claims against all defendants in the underlying action.” Included in the Notice of Appeal is a reservation of the right to move for supplemental attorneys’ fees and expenses. It appears that the Notice of Appeal of October 25, 2005 was timely filed, and no challenge has been raised as to its timeliness.
In the Notice of Appeal, plaintiffs and them counsel challenge:
(1) the District Court’s Opinion and Order dated May 5, 2005, [insofar] as that Order (a) denied plaintiffs’ request for payment of up to treble damages and prejudgment interest to class members, (b) denied in part plaintiffs’ motion for attorneys’ fees, (c) prematurely determined that there were “unclaimed” funds and allocated those funds to charities;
(2) the District Court’s Opinion and Order dated June 6, 2005 denying plaintiffs’ motion for reconsideration of the May 5 Order; and
(3) the District Court’s Elite Model Management Settlement Allocation Order dated July 12, 2005, denying plaintiffs’ request for entry of an allocation order regarding funds to be received from the bankrupt estate of EMMC, Inc., formerly known as (and sued here as) Elite Model Management, Inc.
II. Of the Distribution of Remaining Funds.
The Settlement Agreement approved by the District Court clearly contemplated the need to provide for the distribution of any Excess Funds that might remain after all class members were fully compensated for their actual losses. If those losses, designated as “Total Recognized Losses,” were less than the amount of the “Net Settlement Fund,” the Agreement provided for the Court to “determine the disposition of the amount representing the differences between the two figures, after hearing the views of the parties hereto as to such disposition.” Of course, it was not certain at the time the Agreement was entered into whether there would be Excess Funds, and the Agreement accordingly provided that if Total Recognized Losses exceeded the Net Settlement Fund, the class members would receive distribution on a pro rata basis.
In support of their contention that the Excess Funds should be applied toward treble damages rather than allocated to charities under the Cy Pres Doctrine, plaintiffs bring to our attention the Supreme Court’s observation that “the antitrust private action was created primarily as a remedy for the victims of antitrust violations. Treble damages ‘make the remedy meaningful by counter-balancing the difficulty of maintaining a private suit’ under the antitrust laws.” Am. Soc’y of Mech. Eng’rs, Inc. v. Hydrolevel Corp., 456 U.S. 556, 575, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 485-86 & n. 10, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)) (citations and internal quotation marks omitted). We have noted that “[f]ull restitution of plaintiffs’ losses is a no less central objective of the treble damage provision than the encouragement of private antitrust enforcement.” Hydro-level Corp. v. Am. Soc’y of Mech. Eng’rs, Inc., 635 F.2d 118,127 (2d Cir.1980).
The defendants contend that the Letter Agreements that preceded the Settlement Agreement established the District Court *435 as the final authority for the resolution of any disagreement as to the distribution of the Excess Funds, since they provide that “[a]ny future disagreements as to the form or content of the formal settlement agreement ... will be resolved by the [district court] without right of appeal.” Assuming that the Letter Agreements are binding at this point, the defendants’ contention is based on a misreading of the Agreements. The parties that signed the Letter Agreements (and not all of them did) do not disagree as to the form or content, both of which are plain. The District Court, after hearing the views of the parties, is vested with discretion as to the disposition of the Excess Funds. Defendants argue that the District Court acted reasonably in applying the Cy Pres Doctrine and that plaintiffs were among those who recommended specific charitable organizations. They find support for their position in the fact that the Settlement Agreement makes no provision for treble damages and that one of the counsel for plaintiffs said that “[treble damages are only achieved if you go through, you win your trial, you win your appeal everything becomes final and you actually collect the money.” They contend that the Settlement Agreement refers only to actual losses.
While it is true that the Settlement Agreement reposes discretion in the District Judge as to the disposition of Excess Funds, that discretion is not absolute. Where we find an abuse of discretion in our review of the allocation of funds derived from class settlements, the scheme adopted by the District Court will not be upheld. In re Agent Orange Prod. Liab. Litig. VI, 818 F.2d 179, 181 (2d Cir.1987). We have concluded that a district court abuses its discretion when “(1) its decision rests on an error of law (such as application of the wrong legal principles) or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions.” Zer-vos v. Verizon Netv York, Inc., 252 F.3d 163, 169 (2d Cir.2001). In its original Opinion approving settlement, the District Court considered only the following dispositions: (i) the return of excess settlement funds to the defendants on a pro rata basis; or (ii) in the exercise of its equitable powers, distribution of the funds to charitable organizations. The court stated: “Having adopted the charitable route for these funds, it is my view that wherever possible, the cy pres doctrine should be invoked.” Fears, 2005 WL 1041134, at *11. The court then went on, in accordance with the Cy Pres Doctrine, to allocate the funds to those charities thought to benefit the class, either directly or indirectly. Id. at * 12.
We are not yet prepared to say that the District Court abused its discretion in allocating the Excess Funds under the Cy Pres Doctrine. It does appear, however, that the District Court was not aware of the extent of its discretion, failing to recognize that it was empowered to allocate funds to the members of the class as treble damages. The District Court ultimately held that the terms of the Settlement Agreement barred it from even considering such an alternative. Responding to the motion for reconsideration, the court stated:
Here, the Settlement Agreement lacks any mention of either treble damages or pre-judgment interest. The thirty-page agreement is noticeably silent as to damages, treble or otherwise. As such, the Court did not insert treble damages or prejudgment interest into the four corners of the Settlement Agreement, and it would have been wrong to do so.
Fears, 2005 WL 1325297, at *3.
While it is true that the Clayton Act does not allow for prejudgment interest in *436 the absence of a finding of bad faith on the part of defendants causing a material delay in the adjudication of the dispute, 15 U.S.C. § 15(a), a finding not made here, a treble damages award did lie within the ambit of the District Court’s discretion and should be considered on remand. See, e.g., In re Folding Carton Antitrust Litig., 557 F.Supp. 1091, 1104-07 (N.D.I11.1983) (recognizing the district court’s discretion to consider whether excess funds in antitrust class action settlement could be awarded equitably as treble damages after claimants were paid in full), ajfd in part, vacated in part on other grounds, 744 F.2d 1252 (7th Cir.1984).
In exercising its discretion, the District Court should bear in mind that the purpose of Cy Pres distribution is to “put[] the unclaimed fund to its next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class.” 2 Herbert B. Newberg & Alba Conte, New-berg on Class Actions § 10:17 (4th ed.2002) (emphasis supplied). Cy Pres means “as near as possible,” and “[cjourts have utilized Cy Pres distributions where class members are difficult to identify, or where they change constantly, or where there are unclaimed funds.” Id. at § 10:16 n. 1. In this connection, we take note of the recent Draft of the Principles of the Law of Aggregate Litigation by the American Law Institute. With respect to the approval of settlements providing for a Cy Pres remedy, the Draft proposes a rule limiting Cy Pres “to circumstances in which direct distribution to individual class members is not economically feasible, or where funds remain after class members are given a full opportunity to make a claim.” Draft § 3.08, entitled “Cy Pres Settlements.” This proposed rule is consonant with the observation of our sister circuit that “[fjederal courts have frequently approved [the Cy Pres] remedy in the settlement of class actions where the proof of individual claims would be burdensome or distribution of damages costly.” Six (6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1305 (9th Cir.1990). In the case before us, neither side contends that a Cy Pres distribution is appropriate because it would be onerous or impossible to locate class members or because each class member’s recovery would be so small as to make an individual distribution economically impracticable. We are confident that the district court, fully aware of the breadth of its discretion, will see to an appropriate distribution of the funds remaining after the models have been compensated for their actual losses.
III. Of Counsel Fees.
The District Court properly utilized the “percentage of the fund” method in calculating counsel fees, applying the lodestar method “as a ‘cross check’ on the reasonableness of the requested percentage.” Goldberger v. Integrated Res., Inc., 209 F.3d 43, 49-50 (2d Cir.2000). Of course, courts may continue to use the lodestar approach alone in calculating attorneys fees in common fund cases. See Wal-Mart Stores, Inc. v. Visa, USA Inc., 396 F.3d 96, 121 (2d Cir.2005). Whatever method is used, the reasonableness of a common fund fee award is governed by the so-called Goldberger factors: (1) counsel’s time and labor; (2) the litigation’s complexities and magnitude; (3) the litigation risks; (4) quality of representation; (5) the relationship of the requested fee to the settlement; and (6) considerations of public policy. Id. at 121. We recognize that ‘■‘courts have traditionally awarded fees for common fund cases in the lower range of what is reasonable.” Id. at 122.
In this case, the District Court calculated the percentage of the Fund on the basis of the claims made against the Fund, *437 rather than on the entire Fund created by the efforts of counsel. We hold that this was error. We also hold, on the record before us, that it was error for the District Court to take into account, in setting the percentage fee, the conduct for which counsel already was sanctioned. The Magistrate Judge assessed a substantial fine and ordered the exclusion of certain time charges from the fee petition, and it would be unfair to “double count” for the sanctioned conduct.
In computing the fees on the basis of claims made against the Fund rather than on the basis of the entire Fund, the District Court recognized a split of authority on the subject. See generally 7B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1803.1 (2d ed.2004). In siding with courts that compute fees as a percentage of claims made, the District Court saw the alternative procedure as creating a “windfall” for the attorneys. We disagree. The entire Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of the entire class. An allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not. We side with the circuits that take this approach. See Waters v. Int’l Precious Metals Carp., 190 F.3d 1291, 1295 (11th Cir.1999); Williams v. MGM-Pathe Commc’ns Co., 129 F.3d 1026, 1027 (9th Cir.1997).
Our own cases refer to “percentage of the fund, ” Wal-Mart Stores, 396 F.3d at 121 (emphasis supplied), and “percentage of the recovery, ” Goldberger, 209 F.3d at 47 (emphasis supplied). We take these references to be to the whole of the Fund. Use of the entire Fund as a basis for the computation does not necessarily result in a “windfall” because the court may always adjust the percentage awarded in order to come up with a fee it deems reasonable in light of the Goldberger factors. Accordingly, we have held that a “district court did not abuse its discretion in awarding plaintiffs’ counsel a generous fee based on a somewhat low percentage of the fund.” Wal-Mart Stores, 396 F.3d at 123.
In support of its decision that counsel fees should be computed on the basis of funds claimed by class members, the District Court referred to the PSLRA provision entitled “Restriction on Payment of Attorneys’ Fees and Expenses.” Fears, 2005 WL 1041134, at *4. According to that provision, “[tjotal attorneys’ fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class.” 15 U.S.C. § 78u-4(a)(6). But the PSLRA is not applicable to antitrust class actions such as the one before us. It was designed “to reform abusive securities class action litigation” and “to exercise supervision and control of the lawyers for the class.” H.R. REP. NO. 104-369, at 32 (1995) (Conf.Rep.), as reprinted in 1995 U.S.C.A.A.N. 730, 731 (relating to Private Securities Litigation Reform Act of 1995, Pub.L. No. 104-67). The House of Representatives Conference Report also observed that “counsel in securities class actions often receive a disproportionate share of settlement awards” and indicated that the PSLRA is intended to “limit[] the award of attorney[s’] fees and costs to counsel for a class ... to a reasonable percentage of the amount of recovery awarded to a class.” Id. at 736.
The fee restrictions described in the PSLRA do not apply in any context other than securities class actions, and, even if they did, it is not clear how they would apply. The statute speaks in terms of a percentage of damages “actually paid to the class.” But the entire fund created by *438 the efforts of counsel presumably is “paid to the class,” even if some of the funds are distributed under the Cy Pres Doctrine. The PSLRA would not allow for the computation of fees on the basis of such non-damages items as discounts on coupons received in settlement. A key consideration required by the PSLRA “is the result actually achieved for class members, a basic consideration in any case in which fees are sought on the basis of a benefit achieved for class members.” Advisory Comm. Notes to Fed.R.Civ.P. 23, 2003 Amendments. Arguably, the entire Settlement Fund is a “benefit achieved for class members.”
The District Court’s reliance on the CAFA is also misplaced. The CAFA recites as its purpose the following: “To amend the procedures that apply to consideration of interstate class actions to assure fairer outcomes for class members and defendants, and for other purposes.” Class Action Fairness Act, Pub.L. No. 109-2, 119 Stat. 4 (2005). However, the only mention of fees to be allowed to class counsel deals with the award of fees in coupon settlement cases. See 28 U.S.C. § 1712(a)-(c).[2]
IV. Of the Elite Model Management Settlement Allocation Order.
Appellants contend that “[t]he [district] court’s entry of the Allocation Order [of July 12, 2005] sending the funds received from the Elite Settlement back to the bankruptcy court, without notice to the class or an opportunity to submit claims against those funds, was contrary to the plain language and clear intent of the notice provisions of Fed.R.Civ.P. 23(e).” Brief of Plaintiffs-Appellants at 27. But Rule 23(e)(B) provides only that “[t]he court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement.” We have interpreted this provision as follows:
The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness. There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must “fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.” Notice is “adequate if it may be understood by the average class member.”
Walr-Mart Stores, 396 F.3d at 113-14 (internal citations omitted). Moreover, a district court’s decision regarding the form and content of notices sent to class members is reviewed only for an abuse of discretion. In re Agent Orange Prod. Liab. Litig. V, 818 F.2d 145, 168 (2d Cir.1987).
In this case, the District Court clearly felt that the class would have received adequate notice of the Elite Settlement through the Bankruptcy Court proceedings. During the course of this litigation, defendant Elite filed its petition for bankruptcy, and this filing stayed this class action as to Elite. The Bankruptcy Court ordered that all proofs of claim against Elite, including those of the certified class, be filed by June 7, 2004. Thereafter, Elite sent a notice through the Bankruptcy Court to its would-be creditors, including those of the certified class through the Claims Administrator appointed by the District Court.
*439 On April 29, 2004, one of the attorneys representing the plaintiff class informed the District Court of the mailing of the notice and asserted that Elite had violated an Order of the District Court regarding class notices. The District Court responded by letter the same day, informing the attorney that it had consulted with the Bankruptcy Court upon receipt of the letter and that it had been determined that, absent an objection in Bankruptcy Court, lead counsel in the class action would submit a “single class-wide proof of claim” and would “send a second notice to class members, informing them that it would be submitting a joint proof of claim.” Counsel for the class, as well as individual models, filed proofs of claim.
In February 2005, Elite and the class settled their claims and the Bankruptcy Court permitted one claim for the class. Because the claim payment was included as part of a settlement confirmation order, the Bankruptcy Court approved the settlement pursuant to Fed. R. Bankr.P. 9019. Settlement proceeds were to be held in escrow pending the entry of an “allocation order” by the District Court. The 9019 order provided that, to the extent the allocation order directed that all or a portion of the Elite settlement was to be distributed to charity or to holders of other claims besides the class in District Court, such amounts instead would be returned to the Elite estate. No objections to, or appeal from, this order were taken.
The District Court approved the Elite settlement, like all the other settlements, on May 6, 2005. Not until June 2005, when plaintiffs’ attorneys alleged that the class had never received notice of the Elite settlement, was any issue of notice raised. The basis for this argument apparently is that an earlier class notice from the District Court regarding the Settlement Agreement stated (because the action had been stayed as to Elite) that it did not settle claims against Elite. However, it is undisputed that notice was sent through the bankruptcy proceedings, in which class counsel was participating, to all models who had claims against Elite, both as part of the class and as part of a parallel state action.
We agree with the apparent understanding of the District Court that the class had received adequate notice of the Elite settlement through the Bankruptcy Court proceedings and find no abuse of discretion in this regard. Moreover, appellants’ argument here seems to be less directed at a supposed lack of notice and more at the fact that the District Court returned the remainder of the Elite settlement fund to the Bankruptcy Court after determining that the settlement fund would be adequately funded to pay actual damages even without the remainder of Elite’s settlement. This concern is part-and-parcel of appellants’ argument that class members should receive treble damages — a topic which we have dealt with earlier. In any event, we find that the measure of “reasonableness” that we require in cases of this nature has been satisfied and that the notice to the class members with respect to the Elite settlement was in all respects adequate.
CONCLUSION
The orders of the District Court appealed from are affirmed in part and vacated in part, and the case is remanded to the District Court for further proceedings in accordance with the foregoing. All pending motions are denied.

. Plaintiffs' counsel consists of several attorneys and firms. For ease of reference, this Opinion will refer only to the collective "plaintiffs' attorneys” or "class attorneys.”

. It may be, in any event, that upon remand the entire settlement amount will be paid over to the individual claimants, thereby mooting the whole question of what basis should be used for the computation of fees.