BROWN, Circuit Judge,
dissenting:
$880,000,000 is, to use the late Senator Dirksen’s wry phrase, “real money.” That is what has been left on the table for private disbursement in this case. Perhaps one day, I will possess my colleagues’ schadenfreude toward the Executive Branch raiding hundreds-of-millions of taxpayer dollars out of the Treasury, putting them into a slush fund disguised as a settlement, and then doling the money out to whatever constituency the Executive wants bankrolled. But, that day is not today.
The Constitution’s Appropriations Clause ensures the People’s elected representatives “hold the purse.” See The Federalist No. 58, p. 357 (Clinton Rossiter ed., 1961) (J. Madison). “No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.” U.S. Const, art. I, § 9, cl. 7. The Executive Branch may wish to favor certain interests on the taxpayer’s dime. It may wish to use the Judicial Branch’s enforcement of settlement agreements to avoid asking Congress for an appropriation. But the Constitution’s design gives the People’s elected representatives a means to thwart these “overgrown prerogatives.” See The Federalist No. 58, p. 857 *1059 (Clinton Rossiter ed., 1961) (J. Madison). By limiting the “judicial Powér” to resolving “Cases” and “Controversies,” U.S. Const, art. Ill §§ 1-2, the Constitution ensures the Judicial Branch has “no influence over ... the purse.” See The Federalist No. 78, p. 464 (Clinton Rossiter ed., 1961) (A. Hamilton). Expenditures toward the fulfilment of public policy are integral to policymaking itself, and policymaking is left to the legislature. See id. at 464, 467. In short, congressional control over the People’s purse is a structural limit on both the Executive and Judicial Branches. See Clinton v. City of New York, 524 U.S. 417, 451, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (Kennedy, J., concurring) (“Money is the instrument of policy and policy affects the lives of citizens. The individual loses liberty in a real sense if that instrument is not subject to traditional constitutional constraints.”).
But this case exposes a peril to the public fisc with which the drafters never reckoned: cy pres. Originating from the law of trusts and estates, cy pres refers to a court’s power to reform the terms of a trust or gift that is otherwise impossible to effectuate. Rather than revert the unclaimed money or gift back to the defendant, a court may distribute the unclaimed sum for a purpose “as near as possible” to the objectives underlying the trust or gift. See generally Martin H. Redish, Peter Julian & Samantha Zyontz, Cy Pres Relief and the Pathologies of the Modem Class Action: A Normative and Empirical Analysis, 62 Fla. L. Rev. 617, 624 (2010) [hereinafter Redish]. Cy pres seeped its way into class actions after a 1972 article pro-pos,ed that courts distribute unclaimed settlement dollars to whatever non-parties fulfill the litigation’s “purpose.” See id. at 631-32. Cy pres took the judiciary “to the utmost verge of the law” even before it was applied to class actions. See Jackson v. Phillips, 96 Mass. 539, 574 (1867) (quoting the English jurist Lord Kenyon). Now in “class action litigation,” its mere presence raises “fundamental concerns” about the nature of judicial power. See, e.g., Marek v. Lane, — U.S. -, 134 S.Ct. 8, 8-9, 187 L.Ed.2d 392 (2013) (statement of Roberts, C.J., respecting denial of certiorari).
Here, Congress only appropriated money for the Executive Branch to pay settled claims against the United States via the Judgment Fund Act. See 31 U.S.C. § 1304(a) (Judgment Fund Act)'; see also 28 U.S.C. § 2414 (authorizing the Justice Department to pay settled litigation claims using funds appropriated via the Judgment Fund Act). Those claims have already been paid—every Native-American farmer who filed a viable claim of discrimination by the United States has been compensated. And yet, more than half of the Judgment Fund appropriation for this ease—more than $880,000,000—remains. The . Executive Branch and class counsel have devised a cy pres distribution scheme to send these taxpayer dollars to “nonprofits” and “charities” with no claims against the United States. But, the Executive Branch and class counsel tell us not to worry. According to their distribution scheme, these unidentified non-parties fulfill the “purpose” of having “provided agricultural, business assistance, or advocacy services to Native American farmers,” JA 393 (Original Settlement Agreement, ILL), and are thus entitled to receive the remaining taxpayer money. Congress, however, never appropriated money for this expense.
Unfortunately, no party before the Court really cares what Congress authorized. Cy Pres gives the Executive Branch a win-win: By agreeing to a settlement amount that vastly overstated the claimants’ monetary damages, the Executive can use a large dollar amount to reap the political benefits of photo-op compassion towards a discriminated minority group. At the same time, the Executive’s agree *1060 ment to an overstated damages sum ensures enough money is left in the fund to pay favored third parties after the claimants are compensated. See, e.g., Paul F. Figley, The Judgment Fund: America’s Deepest Pocket and Its Susceptibility to Executive Branch Misuse, 18 U. Pa. J. Const. L. 145, 200 (2015) (explaining that the Keepseagle settlement was part of an Obama administration strategy “to neutralize the argument that the government favors black farmers over ... Native Ameriean[s] ... and to court key constituencies”) [hereinafter Figley, The Judgment Fund]. Class counsel gets a piece of the action too: By agreeing to cy pres distributions, the size of the settlement fund is inflated. The larger the settlement’s size, the larger class counsel’s fee award—regardless of how much of the settlement actually pays injured parties (better known as class counsel’s clients). Even Appellant’s protest of the cy pres scheme is not entirely altruistic. He wants the remaining money distributed to already-compensated class members, not returned to the U.S. Treasury. In short, everyone apparently presumed a bloodied-shirt party could be thrown at the taxpayer’s expense. Why risk Congress being a killjoy? See generally Sharon LaFraniere, U.S. Opens Spigot After Farmers Claim Discrimination, N.Y. Times, (Apr. 25, 2013), http://www.nytimes.com/2013/04/26/us/ farm-loan-bias-claims-often-unsupported-cost-us-millions.html [hereinafter LaFrani-ere, Spigot].
Nevertheless, the Constitution’s limitations on judicial power remain, even if “the parties” before a court “cannot be expected to protect” them. See Commodity Futures Trading Comm’n v. Schor, 478 U.S. 833, 851, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). Judicial restraint becomes judicial abdication when the parties keep making mistakes and we keep them from being corrected. Cf. 33 G.K. Chesterton, The Blunders of Our Parties, in The Collected Works of G.K. Chesterton 312, 312-16 (1990). Like the Constitution’s other structural features, “[njeither Congress nor the Executive can agree to waive” the Appropriations Clause. See Freytag v. Comm’r, 501 U.S. 868, 880, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). When the Constitution’s “structural principle^” limiting judicial power are “implicated in a given case, ... notions of consent and waiver cannot be dispositive.” Schor, 478 U.S. at 850-51, 106 S.Ct. 3245.
If the Government wishes to achieve certain purposes by expending taxpayer money to people with no monetary claims against the United States, a legislative appropriation is required. No such appropriation exists here. Neither authorizing nor policing a cy pres distribution scheme in a class action settlement with the United States is consistent with constitutional limitations. Because the money was appropriated to pay claims, and those claims have been compensated, the more than $380,000,000 that remains here should be returned to the American People. But, cy pres permits the judiciary to take more .than half the taxpayer money Congress authorized to pay claims in this case and appropriate the money for something else. This is not justice. It is not even law. I respectfully dissent.
I.

The Constitutionality of Cy Pres Distributions Is Before Us

The majority averts its gaze from the Constitution by invoking the waiver doctrine. But waiver is not proper simply because “[questions may occur which we would gladly avoid.” Cf. Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821) (per Marshall, C.J.). Waiver is a proper conclusion when we follow the doctrine’s guideposts. If those guideposts tell us “we cannot avoid” a difficult question, *1061 then we must “exercise our best judgment, and conscientiously ... perform our duty.” See id. Here, the waiver doctrine provides no security blanket keeping us from cy pres’s constitutional problems.
There are two primary reasons why waiver is inapposite here: (1) this case presents “exceptional circumstances;” and (2) this case raises structural, jurisdictional limitations on judicial power that cannot be waived.
Some background information is essential to grasping this case’s exceptional circumstances and the structural constitutional limitations it raises:
The Keepseagle case is one of several class actions attempting to capitalize on successful litigation under the Equal Credit Opportunity Act (“ECOA”), where African-American farmers were treated unfairly in loan programs, crop payments, and disaster payments run by the U.S. Department of- Agriculture. Congress facilitated these cases by amending ECOA’s statute of limitations. See Stephen Carpenter, The USDA Discrimination Cases: Pigford, In re Black Farmers, Keepseagle, Garcia, and Love, 17 Drake J. Agrio. L. 1, 15-16 (2012) (discussing the statute of limitations problem in Pigford I). The class litigation involving African-American farmers was incredibly successful—leading to, most notably, Congress appropriating a settlement payout of $2,000,000,000 for resolving the Pigford II litigation. See, e.g., Figley, The Judgment Fund, 18 U. Pa. J. Const. L. at 189-92 (detailing the African-American farmers’ class litigation).
' The success of the African-American class litigation owed more to politics than law. See, e.g., id. at 193 (“President Bill Clinton and President Barack Obama favored the farmers’ claims, and their political appointees actively supported the settlements over the objections of some earéer officials.”); LaFraniere, Spigot (quoting Congressman Steve King, who explained Congress’s appropriation by saying, “[njever underestimate the fear of being called a racist”). But, no matter how political the Executive’s litigation strategy may have been, “the [settlement] payments were made in a manner that respected the Judgment Fund.” Figley, The Judgment Fund, 18 U. Pa. J. Const. L. at 193. Congress “allowed” the African-American class litigation when it expanded ECOA’s statute of limitations, and it “appropriated money ... with full knowledge of the terms of the agreement” settling Pigford II. See id; see also Todd David Peterson, Protecting The Appropriations Power: Why Congress Should Care About Settlements at the Department Of Justice, 2009 B.Y. U. L. Rev. 327, 362 (2009) (“Rather than leaping over or subverting the limitations imposed by Congress’s control over the circumstances in which money judgments may be obtained against the United States, the Department of Justice went to Congress for the appropriate authority before it settled the case.”).
Keepseagle, however, has all of these political motivations but none of the respect for Congress’s control over the purse. The Executive Branch neither sought a specific appropriation for this case, nor did Congress ever authorize the Executive to send taxpayer money appropriated for settled lawsuits to non-injured third-parties with no claims against the United States. See Figley, The Judgment Fund, 18 U. Pa. J. Const. L. at 194-97. Why, you may ask, would the Executive Branch avoid asking Congress for a specific appropriation for Keepseagle? Congress, in writing a multi-billion dollar appropriation for Pigford II, demonstrated its willingness to pay large sums to resolve discrimination claims against the United States. But, the difference with Keepseagle is the purpose of the settlement. This settlement—as the more than $380,000,000 *1062 remaining for cy pres distribution now confirms—went far beyond compensating injured Native-American farmers; it sought to ensure favored “nonprofits” and “charities” were'flushed with cash.[1]
As the majority acknowledges, when the Keepseagle class was first certified in 2001, it was certified only for injunctive relief—the district court deferred the question whether the class deserved monetary relief. See Keepseagle v. Veneman, 1:99-cv-03119, 2001 WL 34676944, at *14 (D.D.C. Dec. 12, 2001). Yet the Judgment Fund does not apply to injunctive relief. Without class certification for monetary relief, a large settlement payout was impossible; the Keepseagle plaintiffs would have to individually litigate any claims for monetary damages. But the claims of the class claimants were quite facile, and individually-litigated cases are seldom as lucrative as class actions. See LaFraniere, Spigot (“Depositions had revealed many of the individual farmers’ complaints to be shaky. And federal judges had already scornfully rejected the methodology of the plaintiffs’ expert, a former Agriculture Department official named Patrick O’Brien, in the [female farmers’] case.”); see also Garcia v. Veneman, 224 F.R.D. 8, 16 (D.D.C. 2004) (“The history of the Pigford (black farmers) class action litigation amply demonstrates that ... it is the questions affecting only individual members that predominate.”); Barry Sullivan & Amy Kobelski Trueblood, Rule 23(f): A Note on Law and Discretion in the Courts of Appeals, 246 F.R.D. 277, 279 (2008) (“Where a class is not certified, the plaintiffs (and their lawyer) may not have the will—or the resources—to continue with a litigation that [may] yield only a small recovery and little basis for an award of substantial attorneys’ fees.”).
For most of this lawsuit’s history, the Executive Branch was not helping class counsel out of this little conundrum. From the lawsuit’s filing in 1999 to December 2009, the Executive Branch “hotly contested” the mere existence of monetary damages. See Keepseagle v. Vilsack, 118 F.Supp.3d 98, 105-06 (D.D.C. 2015). Even after “nearly ten-years” of “extensive and contentious discovery and motions practice,” the Executive Branch insisted on the non-existence of money damages. See id. Discovery gave the Executive good reason to remain insistent—“this nearly decade-long battle resulted in a narrowing of the plaintiffs’ claims.” See id. In fact, in October 2009, the Executive Branch went so far as to tell the district court that the narrowing of Plaintiffs’ “theory of the case and supporting law” was so “considerable]” that it “call[ed] into question the previous class definition.” See Gov’t Mem. *1063 in Opposition to Plaintiffs’ Mot. for Order Regarding the Establishment of Class Membership at 4, Keepseagle v. Vilsaek, No. 1:99-cv-03119 (D.D.C. Oct. 23, 2009), ECF 541. Yet, a mere six weeks later, even as the deadline for the Executive Branch’s submission of a rebuttal expert report on damages approached, the Justice Department agreed to stay the case—concluding that “settlement discussions are appropriate at this time.” See Joint Mot. to Stay at 2, Keepseagle v. Vilsaek, 1:99-cv03119 (D.D.C. Dec. 3, 2009), ECF 548.
In late 2009, the Executive Branch went from disputing the existence of money damages to embracing a settlement agreement that pays the Plaintiffs “nearly 90%” of their “estimated total damages,” $776,000,000, $680,000,000 of which came from the Judgment Fund. See Keepseagle, 118 F.Supp.3d at 106. Given the $380,000,000 remaining from the Judgment Fund appropriation after class claimants were compensated, we now know Plaintiffs’ money damage estimates were wildly off-base.[2] Class counsel, though, received a $60,800,000 payday—roughly four times class counsel’s actual expenses.[3] None of this should have surprised the Executive Branch. When it came before this Court to contest the deferral of class certification on monetary damages, the Justice Department said the following: “ ‘This case is, at bottom, about compensatory relief for past wrongs,’ creating a 'threat of ‘hydraulic’ pressure to settle” for a large sum. See In re Veneman, 309 F.3d 789, 794 (D.C. Cir. 2002) (quoting the Justice Department). Moreover, the Government’s damages expert, Economics and Statistics Professor Gordon C. Rausser of the University of California, Berkeley, “produced a 340-page report stating that [Plaintiffs’ expert’s damages] conclusions were based ‘in a counter-factual world’ and that Native Americans had generally fared as well as *1064 white male farmers.” LaFraniere, Spigot. “ ‘If they had gone to trial, the government would have prevailed,’ he said. ‘It was just a joke,’ he added. ‘Í was so disgusted. It was simply buying the support of the Native-Americans.’ ” Id. By settling, however, the Executive Branch never filed its rebuttal expert report.
Both the original settlement agreement and the addendum appealed here require court approval of the cy pres recipients class counsel will propose. See JA 393 (Original Settlement Agreement, II.I); JA 1170 (Proposed Settlement Agreement Addendum, II.A-B). Court approval is also required for the “awards” class counsel proposas that these cy pres recipients receive. See JA 423 (Original Settlement Agreement, IX.7); JA 1172 (Proposed Settlement Agreement Addendum, IV.A). No adjudicative standard is set forth for approving either the cy pres recipients or their distributions, other than that these recipients fulfill the “purpose” of having “provided agricultural, business assistance, or advocacy services to Native American farmers,” e.g., JA 393 (Original Settlement Agreement, II.I). The proposed addendum adds an equally-fraught twist: The “primary cy pres beneficiary” will be a newly-created “Native American Agriculture Fund.” JA 1170 (Proposed Settlement Agreement Addendum, II.B). Class counsel will select the Trust Fund’s Board of Trustees and its Executive Director, and a court will be tasked with approving those selections. See id.
Nothing prohibits class counsel from serving on the Trust Fund’s Board (or as its Executive Director), nor is the Executive Branch in any way prevented from “suggesting” names for class counsel’s nomination (nor, presumably, is a court so limited). Moreover, this Trust Fund will be tasked with using its taxpayer-funded cy pres money to, among other .things, “educate the public on agricultural issues, the needs of Native American farmers and ranchers, and other matters related to the Trust’s Mission, including by advocating for a particular position or viewpoint” (the Trust Fund does purport to be a nonpolitical nonprofit, however). JA 1180.
The settlement agreement here strongly suggests its exorbitant sum is not the result of, as the Executive Branch preposterously contends, “the level of sophistication and effectiveness of the lawyers representing the class’s interests!,] ... as well as the legal backdrop against which the parties negotiated.” Gov’t Br. 23. Rather, political calculations explain the settlement. Cf. Keepseagle, 118 F.Supp.3d at 104 (suggesting the Government settled this case because it “implicated deep-seated interests of justice” even if “the government’s legal defense may be relatively strong”). An internal memorandum within the Department of Agriculture from March 2010 says Keepseagle was part of an Obama administration effort “to neutralize the argument that the government favors black farmers, over Hispanic, Native American or women farmers.” LaFraniere, Spigot; see also id. (“Sweeping settlements with the three groups, [Tony] West [Assistant Attorney General of the Justice Department’s Civil Division], argued, would eliminate legal risks and smooth relations between the Agriculture Department and important constituencies.”); Press Release, Agriculture Secretary Vilsack and Attorney General Holder Announce Settlement Agreement with Native American Farmers Who Claim to Have Faced Discrimination by USDA in Past Decades, Release No. 0539.10 (Oct. 19, 2010) https://www.usda. gov/wps/portal/usda/usdamediafb? contentid=2010/10/0539.xml& printable=true& contentidonly=true (“[S]hortly after [Secretary Vilsack] took office he sent a memo to all USDA employees calling for ‘a new era of civil rights’ for the *1065 Department. In February 2010, Secretary Vilsack announced the Pigford II settlement with black farmers; the Keepseagle settlement continues as part of that new erá. Meanwhile, Secretary Vilsack continues to pursue the resolution of all claims of past discrimination against USDA.”). Reporting also indicates “the payouts pitted [the Secretary of Agriculture] and other political appointees against career lawyers and agency officials, who argued that the legal risks did not justify the costs” to the taxpayer. LaFraniere, Spigot.
My colleague suggests we should ignore this case’s context because it is not “found in the record.” Concurrence at 1056. Of course, the district court not only acknowledged this context—it expressed sympathy with the Executive Branch’s preference for political largess over legal defense.[4] See Keepseagle, 118 F.Supp.3d at 104 (“The statements of the President, Secretary Vil-sack, and then-Attorney General Holder make clear that the government in 2010 understood this dimension of the case.... The government's] [lawyers] would do well to remove [their] legalistic blinders.”); but see Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion, 23 Op. O.LC. 126, 137 (1999) (“The Attorney General generally possesses the con-gressionally conferred power to settle on terms that would serve the best interests of the United States, but the considerations and terms that inform and structure a settlement must be traceable, nonetheless, to a discernible source of statutory authority.” (emphasis added)) [hereinafter Settlements Limiting the Future Exercise of Executive Branch Discretion]. Despite the district court’s obvious sympathy, it still questioned whether the Judgment Fund Act permitted a cy pres distribution:
The result is that $380,000,000 of taxpayer funds is set to be distributed inefficiently to third-party groups that had no legal claim against the government. Although a $380,000,000 donation by the federal government to charities serving Native American farmers and ranchers might well be in the public interest, the [c]ourt doubts that the judgment fund from which this money came was intended to serve such a purpose. The public would do well to ask why $380,000,000 is being spent in such a manner.
Keepseagle, 118 F.Supp.3d at 104. But the district court reasoned the parties’ consent to the final judgment put the cy pres issue “beyond the realm of the law and into the realm of politics and policy.” Id; see also id. at 121 (“[T]he [c]ourt is not persuaded that it has any authority to declare void portions of an agreement that was negotiated by the parties, approved by the [e]ourt pursuant to [Rule] 23, and finalized on appeal (either by affirmance of the Court of Appeals or by the lack of any timely appeal).”). In considering the cy pres amendment at issue here, both the district court and the majority continue to treat the parties’ consent as a means to circumvent constitutional limitations on judicial power.

A.

Exceptional Circumstances Are Present

“[A] federal court is more than ‘a recorder of contracts’ from whom parties can purchase [relief].” Local Number 93, Int’l *1066 Ass’n of Firefighters v. Cleveland, 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). Congress did not create the Judgment Fund for the Executive to dispense political favors, but to pay lost or settled litigation claims against the United States. See 31 U.S.C. § 1304(a) (appropriating money “to pay final judgments, awards, [and] compromise settlements,” and limiting that appropriation to when: payment is not authorized by another source; the Treasury Department has certified the payment; and “the judgment, award, or settlement is payable” under a statute Congress designated for such payment). “The Framers fully recognized that nothing would so jeopardize the legitimacy of a system of government that relies upon the ebbs and flows of politics to ‘clean out the rascals’ than the possibility that those same rascals might perpetuate their policies simply by locking them into binding contracts.” U.S. Tr. Co. v. New Jersey, 431 U.S. 1, 45, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) (Brennan, J., dissenting). Even the Executive Branch has acknowledged that, despite its “sweeping” power to settle lawsuits, “the Attorney General must, as a general matter, exercise her broad settlement discretion in a manner that conforms to the specific statutory limits that Congress has imposed upon its exercise.” Settlements Limiting the Future Exercise of Executive Branch Discretion, 23 Op. O.LC. at 136.
When exceptional circumstances are present, “the courts of appeals” possess “the discretion” to decide “what questions may be taken up and resolved for the first time on appeal.” Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Exceptional circumstances are present when “the proper resolution is beyond any doubt, or where injustice might otherwise result.” Id. (internal citation omitted). Here, such circumstances exist, justifying us in addressing Appellant’s challenge to the settlement agreement’s cy pres provisions.

i.

The Proper Resolution Is Not In Doubt

The Appellant, Keith Mandan (“Man-dan”), argues that cy pres distribution violates the Appropriations Clause and the Judgment Fund Act. This is his lead argument within his opening brief. Both the Executive Branch and the Plaintiff-Appel-lees briefed this issue too. Moreover, the Executive Branch is right when it claims Mandan’s argument challenges cy pres distributions in class action settlements with the United States generally—not just the cy pres distribution scheme proposed within the addendum to this settlement agreement. See Gov’t Br. 18; cf Appellant Opening Br. 22-29. Poignantly, the Executive Branch set forth the proper remedy within its own brief. See Gov’t Br. 24 (“If the remaining $3[8]0 million in taxpayer money indeed remains part of the public fisc and need not be distributed according to the terms of the 2011 settlement agreement, then the most appropriate disposition of this unexpectedly large sum would be for it to revert to the Treasury.” (emphasis added)). This is, therefore, not a case where “the opposing party los[t] its opportunity to contest the merits,” or where “an improvident or ill-advised opinion on the legal issues” is at risk. See Se. Mich. Gas Co. v. FERC, 133 F.3d 34, 42 n.3 (D.C. Cir. 1998). The result and issue are squarely raised before us.
“Deciding fully briefed, purely legal questions is a quotidian undertaking for an appellate court.” See Ass’n of Am. R.R. v. U.S. Dep’t. of Transp., 821 F.3d 19, 26 (D.C. Cir. 2016). The concurrence claims the proper resolution of a fully briefed legal issue can still be in doubt, so “exceptional circumstances” cannot be invoked on that ground. See Concurrence at 1057-58. *1067 This view does not follow from our precedent. See Hodge v. Talkin, 799 F.3d 1145, 1171 (D.C. Cir. 2015) (“The district court ... did not reach Hodge’s vagueness challenge .... Here, we find it appropriate to consider Hodge’s vagueness claim. Not only does he ask us to address the challenge, but it raises pure questions of law. And the government joins issue with Hodge’s arguments on the merits rather than suggesting that we forbear on the matter.”). To be sure, the Executive Branch argues waiver. But as noted above, the Executive Branch also set forth a detailed response on the merits and identified the proper remedy. This is thus unlike the circumstance in which we declined addressing constitutional issues surrounding cy pres. Cf. Democratic Cent. Comm. v. Wash. Metro. Area Transit Comm’n, 84 F.3d 451, 455 n.2 (D.C. Cir. 1996) (declining to address the “controversial” use of cy pres distributions in class actions against the United States because, unlike here, “[t]his case ... is not a class action; the constitutional challenges mentioned above are not at issue here.”). We cannot be transgressing our discretion by resolving this issue.

ii.

Invoking Waiver Results In Injustice

By failing to consider Mandan’s cy pres challenge, we permit a fundamental injustice: cy pres allows the Executive Branch to circumvent checks on its own power with the Judicial Branch’s imprimatur. The acceptability of circumventing the congressional appropriations process under the guise of Article III is “extraordinarily important and deserves a ‘definitive answer.’” See Al Bahlul v. United States, 840 F.3d 757, 760 n. 1 (D.C. Cir. 2016) (en banc) (Kavanaugh, J., concurring) (quoting Al Bahlul v. United States, 767 F.3d 1, 62 (D.C. Cir. 2014) (en banc) (Brown, J., concurring in judgment and dissenting in part)). This issue raises the proper relationship of our Federal Government’s three branches when dealing with the People’s money. Moreover, “other cases in the pipeline require a clear answer to [this] question.” See id. As Chief Justice Roberts recently noted, “[c\y pres remedies ... are a.growing feature of class action settlements.” Marek, 134 S.Ct. at 9 (statement of Roberts, C.J., respecting denial of cer-tiorari). Other legal commentators have also noted this trend. See Redish at 661 (“[T]he prevalence of class action cy pres awards has increased steadily by decade since the 1980s and has accelerated noticeably after 2000.”). Additionally, cy pres distribution in this case is not merely dispensing a “residual” amount—it will dispose of more than half of this settlement fund. Even by cy pres standards (such as they are), this is exceptional. See, e.g., In re Baby Prods. Antitrust Litig., 708 F.3d 163, 174 (3d Cir. 2013) (“Barring sufficient justification, cy pres awards should generally represent a small percentage of [the] total settlement funds.”).
In sum, if these circumstances are not exceptional, I do not know what defines “exceptional circumstances.”

B.

Structural Constitutional Objections Are Present

The source of the “exceptional circumstances” here is its own basis for not invoking waiver: a “neither frivolous nor disingenuous” “constitutional challenge” to “the validity of the ... proceeding that is the basis for th[e] litigation.” See Freytag, 501 U.S. at 879, 111 S.Ct. 2631. Specifically, the structural issue before us is the district court’s power to approve and police a cy pres distribution scheme without congressional appropriation.
*1068 The fact that Mandan consented to the 2011 agreement is immaterial. “[Cjonsent” cannot “excuse an actual violation of Article III,” see, e.g., Wellness Int’l Network, Ltd. v. Sharif, — U.S. —, 135 S.Ct. 1932, 1945 n.10, 191 L.Ed.2d 911 (2015), and that is what Mandan’s Appropriations Clause claim presents.[5] We must be willing to assess claims that the Judicial Branch acted with power entrusted to another branch of the Federal Government. See Freytag, 501 U.S. at 879, 111 S.Ct. 2631 (“[TJhe disruption to sound appellate process entailed by entertaining objections not raised below does not always overcome what Justice Harlan called ‘the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers.’ ” (internal citation omitted)).[6]
Our Founders “lived among the ruins of a system of intermingled legislative and judicial powers.” Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 219, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). Judges were under the King’s thumb, while legislatures were often obstructed in their ability to make policy. See generally The Declaration of Independence (U.S. 1776). In response, the Founders created a judiciary “truly distinct from both the legislature and the executive.” The Federalist No. 78, p. 465 (Clinton Rossiter ed., 1961) (A. Hamilton). The “judicial [pjower” was limited to “renderpng] dispositive judgments” in “cases” or “controversies” within the scope of federal jurisdiction. See Plaut, 514 U.S. at 218-19, 115 S.Ct. 1447. The judiciary thus received “no influence over ... the. purse.” The Federalist No. 78, p. 464 (Clinton Rossiter ed., 1961) (A. Hamilton). As the Constitution gave the appropriations power to the American People’s elected representatives, our founding document “assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants.” OPM v. Richmond, 496 U.S. 414, 427-28, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990); cf. Freytag, 501 U.S. at 880, 111 S.Ct. 2631 (“The *1069 structural interests ... are not those of any one branch of Government but of the entire Republic.”).
Cy pres distribution schemes in class actions against the United States confound judicial power; reverting us to the time when the King could circumvent the People’s representatives through the judiciary. Ninth Circuit Judge Andrew Kleinfeld described the problem of cy pres in class actions rather ominously given Keepsea-gle’s facts:
A defendant may prefer a cy pres award to a damages award, for the public relations benefit. And the larger the cy pres award, the easier it is to justify a larger attorneys’ fees award. The incentive for collusion may be even greater where ... there is nothing to stop [the lawyers for both sides] from managing the [cy pres recipient(s) ] to serve their interests....
Lane v. Facebook, Inc., 696 F.3d 811, 834 (9th Cir. 2012) (Kleinfeld, J., dissenting).[7] Some circuits recognize this potential for conflicting interests and promise “careful scrutiny” of cy pres provisions. See, e.g., In re Baby Prods. Antitrust Litig., 708 F.3d at 175; Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 785-86 (7th Cir. 2004). Other circuits attempt to implement cy pres distributions only where “it is not possible to put those funds to their very best use: benefitting the class members directly.” Klier v. Elf Atochem N. Am. Inc., 658 F.3d 468, 475 (5th Cir. 2011); Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2007); In re Pharm. Indus. Average Wholesale Price Litig., 588 F.3d 24, 35 (1st Cir. 2009). But the fact remains: “It is inherently dubious to apply a doctrine associated with the voluntary distribution of a gift to the entirely unrelated context of a class action settlement, which a defendant no doubt agrees to as the lesser of various harms confronting it in litigation.” Klier, 658 F.3d at 480 (Jones, C.J., concurring) (emphasis added). The reality Judge Jones identified is at play here. The Executive Branch saw an opportunity to exploit a large settlement award without having to ask Congress for money, class counsel saw the promise of a large fee award, and, suddenly, doubtful claims for monetary damages became a class action worth more than half-a-billion taxpayer dollars.
Both the district court and Mandan consider the American Law Institute’s Principles of the Law of Aggregate Litigation to set forth “reasonable” criteria to police cy pres’s use in class actions. See Keepseagle, 118 F.Supp.3d at 116-17; Plaintiff-Appel *1070 lant Opening Br. 39-40 (citing Principles of the Law of Aggregate Litigation § 3.07 (2010) (“ALI Principles")). Yet these principles suggest what the Appropriations Clause and Article III require: Cy pres should' never be used in class action settlements with the United States.
The ALI Principles presume, first and foremost, a settlement fund’s outstanding monies will fully compensate class members for their damages. See ALI Principles § 3.07(b). But that presumption is inapplicable when, as here, the class members have been fully compensated.
The ALI Principles prefer that outstanding monies are distributed to those “whose interests reasonably approximate those being pursued by the class.” Id. § 3.07(c). This is achieved by reversion to the Treasury, where Congress can— through the appropriations process—approximate the interests of the class. Because Congress can reasonably approximate the class’s interests, reversion to the Treasury is different in kind from reversion to a private defendant. See ALI Principles § 3.07(b) cmt.-b (explaining reversion to the defendant “would undermine the deterrence function of class actions and the underlying substantive-law basis of the recovery by rewarding the alleged wrongdoer simply because distribution to the class would not be viable”). Congress has a long track record of reasonably approximating the interests of various classes through the creation of victim compensation funds.[8] Moreover, allowing Congress the opportunity to reasonably approximate class interests furthers “the underlying substantive-law basis of the recovery” by honoring Congress’s limits on the Judgment Fund Act. Reversion to the Treasury ensures public accountability, avoids conferring standing on non-injured third parties to contest cy pres distributions, and it comports with Congress deciding whether the Government should waive sovereign immunity and be liable for certain claims in the first instance.[9]
Cy pres distributions, given their range of potential beneficiaries, their attenuated relationships to actual class members, and their focus on fulfilling a general “purpose” rather than remediating monetary damage, resemble legislative appropriation. See, e.g., Redish at 624; Goutam U. Jois, The Cy Pres Problem and the Role of Damages in Tort Law, 16 Va. J. Soc. Pol’y & L. 258, 260 (2008); cf. also The Federalist No. 75, at 449 (Clinton Rossiter ed., 1961) (A. Hamilton) (distinguishing legislative and executive power by inquiring into “the particular nature of the power” at *1071 issue, and identifying “[t]he essence of legislative authority” in the prescription of general rules for society). Yet Congress made no such appropriation here, and no part of the appropriations process is within the judicial power. See Buckley v. Valeo, 424 U.S. 1, 123, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (holding Article III courts may not exercise “executive or administrative duties of a nonjudicial nature”); In re BankAmerica Corp. Sec. Litig., 775 F.3d 1060, 1066 (8th Cir. 2015) (“Distribution of funds at the discretion of the court is not a traditional Article III function,” rendering such a cy pres provision “void ab initio.”); In re Compact Disc Minimum Advertised Price Antitrust Litig., 236 F.R.D. 48, 53 (D. Me. 2006) (“Federal judges are not ... accustomed to deciding whether certain nonprofit entities are more ‘deserving’ of limited funds than others; and we do not have the institutional resources and competencies to monitor that ‘grantees’ abide by the conditions we or the settlement agreements set.”). Accordingly, regardless of the cy pres provision’s form, approving recipients and distributions in class actions against the United States gives a court the very influence over the purse prohibited by Article III. Cf. The Federalist No. 78, at 465 (Clinton Rossiter ed., 1961) (A. Hamilton).
Even in class actions where cy pres distributions are not made from the public fisc—and the comingling of legislative and judicial power is not implicated—cy pres is problematic for judicial power. A court risks violating Article III justiciability requirements should it adjudicate disputes between cy pres recipients and would-be recipients, as none would possess an injury-in-fact. See Lewis v. Cont’l Bank Corp., 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990) (holding Article III prohibits federal courts from “decidfing] questions that cannot affect the rights of litigants in the case before them” (emphasis added)); see also Klier, 658 F.3d at 481 (Jones, C.J., concurring) (explaining how cy pres distributions “transform! ] the judicial process from a bilateral private rights adjudicatory model into a trilateral process”). In this trilateral process, there is no neutral, adjudicative standard by which a court can determine the “next best” recipient of settlement money—or what to do with the money when no “next best” recipient bears any relationship to the class. See, e.g., In re Motorsports Merch. Antitrust Litig., 160 F.Supp.2d 1392, 1399 (N.D. Ga. 2001) (distributing, via cy. pres, approximately $2 million remaining in a settlement pool from a consumer price-fixing lawsuit to nine different organizations, ranging from drug prevention programs, a breast cancer foundation, and a children’s hospital, even though none of those organizations bore any relationship to the injured class—Georgia NASCAR fans).[10]
*1072 Keepseagle reveals that nothing short of the Constitution’s enumerated limits on power can protect the taxpayer’s money and the judiciary’s integrity. The Executive Branch has an independent obligation to assess the constitutionality of its own conduct. In the first instance, politics should not have been allowed to permit what the Appropriations Clause would prohibit. Similarly, in the first instance, the district court should have never allowed the parties’ consent to override its independent obligation to not approve agreements that transgress Article Ill’s limits.[11] See, e.g., Freytag, 501 U.S. at 896, 111 S.Ct. 2631 (Scalia, J., concurring in part and concurring in the judgment) (“[A] litigant’s prior agreement to a judge’s expressed intention to disregard a structural limitation upon his power cannot have any legitimating effect—ie., cannot render that disregard lawful. Even if both litigants not only agree to, but themselves propose, such a course, the judge must tell them no.”); see also Se. Fed. Power Customers, Inc. v. Geren, 514 F.3d 1316, 1321 (D.C. Cir. 2008) (“[T]he district court could hardly approve a settlement agreement that violates a statute....”). But the violation to our Constitution’s structure here is not merely ex ante to approving this settlement agreement’s cy pres provisions. This violation is ongoing and is jurisdictional.
The parties have been squabbling over how to modify the cy pres provisions to their respective benefit for nearly four years—indeed, that dispute underlies this appeal. See Keepseagle v. Vilsack, 307 F.R.D. 233, 238 (D.D.C. 2014) (dating the “potential modification” of the cy pres provisions to at least August 2013). The Court’s opinion today ensures this will continue, as approval of cy pres recipients and distributions—or any additional changes to the cy pres scheme—will rest solely on what led to the error in the first instance: substituting the parties’ consent for constitutional requirements. This sort of Government-By-Autopilot cannot be reconciled with our Constitution. Cf. Randy Barnett, The Origination Clause and the Problem of “Double Deference,” The Volokh Conspiracy, Washington Post (Mar. 12, 2014), https://www.washingtonpost.com/news/ volokh-conspiracy/wp/2014/03/12/the-origination-clause-and-the-problem-of-double-deference/?utm_term=.900b86fc81 el (“[I]f the courts defer constitutional judgments to Congress, and Congress defers constitutional judgments to the courts, then no one is considering the Constitution itself. Double deference is a shell game.”).
“Abdication of responsibility is not part of the constitutional design.” Clinton, 524 U.S. at 452, 118 S.Ct. 2091 (Kennedy, J., concurring). But as a result of the majority’s reticence, the judiciary will now be distributing more than $380,000,000 of taxpayer money without congressional appropriation and outside the confines of a case or controversy. “[T]o permit the appellate court to ignore” this jurisdictional, structural defect “because of waiver would be to give the waiver legitimating, as opposed to merely remedial, effect, ie., the effect of approving, ex ante, unlawful action by the appellate court itself.” Freytag, 501 U.S. at 896-97, 111 S.Ct. 2631 (Scalia, J., concurring in part and concurring in the judgment). The Executive Branch cannot continue to pursue this course, and the Judicial Branch had no more power to in *1073 dulge it today than it had the power to approve the initial cy pres provisions. We had an opportunity to eliminate this constitutional breach before it results in material damage to the Constitution’s limitations—the approval of cy pres recipients and cy pres distributions of taxpayer money. Waiving away these constitutional problems is a dereliction of duty.
II.
The Appropriations Clause and the Judgment Fund Act Bar a Cy Pres Settlement Provision

A.

Congress Only Appropriated Money To Pay “Claims” Against the United States

Turning to the merits of Mandan’s claim, there is no doubt that the Keepsea-gle settlement reveals a dramatic dilution of Congress’s power of the purse—and an abuse of the judiciary’s limited role—in furtherance of the Executive Branch’s political priorities.
Under our Constitution’s Appropriations Clause, the American People’s elected representatives possess “a controlling influence over the executive power.” See 1 Joseph Story, Commentaries on the Constitution of the United States, § 531, p. 384 (Thomas M. Cooley ed., 4th ed. 2011) (emphasis added). By holding this power, Justice Story explained, Congress “holds at its own command all the resources by which a chief magistrate could make himself formidable.” Id.
The Supreme Court is as stout-hearted as Justice Story. In its very first Appropriations Clause decision, the Court unanimously stated “[i]t is a well-known constitutional provision, that no money can be taken or drawn from the Treasury except under an appropriation by Congress.” Reeside v. Walker, 52 U.S. (11 How.) 272, 291, 13 L.Ed. 693 (1850); see also Cincinnati Soap Co. v. United States, 301 U.S. 308, 321, 57 S.Ct. 764, 81 L.Ed. 1122 (1937) (explaining the Appropriations Clause “was intended as a restriction upon the disbursing authority of the Executive department”). Even in more recent years, the Court has not wavered. See, e.g., United States v. MacCollom, 426 U.S. 317, 321, 96 S.Ct. 2086, 48 L.Ed.2d 666 (1976) (plurality opinion) (“The established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress.”).
Moreover, the Court has recognized the Clause as a limitation on the Executive Branch’s disbursement authority in legal settlements. See Richmond, 496 U.S. at 427-28, 110 S.Ct. 2465. The Executive Branch threatens the Constitution’s structure if it “were able, by [its] unauthorized oral or written statements to citizens, to obligate the Treasury for the payment of funds.” Id. at 428, 110 S.Ct. 2465. In that circumstance, “control over public funds that the Clause reposes in Congress in effect could be transferred to the Executive.” Id. The question here, therefore, is whether the Executive’s “statements to citizens,” ie., what it promised to private parties via settlement, were “authorized” by congressional appropriation. Any part of the Executive’s agreement with the private party not “authorized” by congressional appropriation cannot be enforced.
Here, as Mandan explains, two congressional statutes effectuate all that Congress has authorized respecting the Keepseagle claims: the Judgment Fund Act and the settlements authority statute. 31 U.S.C. § 1304(a) (Judgment Fund Act); 28 U.S.C. § 2414 (settlements authority statute). These two appropriations are interrelated—the Judgment Fund Act authorizes the payment of “compromise settlements” under the settlements authority statute. *1074 See 31 U.S.C. § 1304(a)(3)(A) (citing 28 U.S.C. § 2414, permitting the “Payments of judgments and compromise settlements” from district courts and the Court of International Trade). The Judgment Fund is not to be used as another source of congressional appropriation to an agency’s programs. Rather, it is designed to ensure claimants “receive prompt payment without awaiting a special appropriation.” United States v. Maryland, 349 F.2d 693, 695 (D.C. Cir. 1965). The settlements authority statute is broad, but, as explained above, its use must “conform! ]” tó its “specific statutory limits.” See Settlements Limiting the Future Exercise of Executive Branch Discretion, 23 Op. O.LC. at 136.
The settlements authority statute gives the Attorney General power to settle “claims ... for defense of imminent litigation or suits against the United States,” and such claims “shall be settled and paid in a manner similar to judgments in like causes.” 28 U.S.C. § 2414 (emphasis added). The Government Accountability Office (“GAO”) has illuminated some of these terms. It explains “for defense of imminent litigation or suits against the United States” means “[t]he agency must be confronted with a genuine disagreement or impasse .... There must be a legitimate dispute over either liability or amount.” U.S. Gov’t Accountability Off., GAO-08978SP, 3 Principles of Federal Appropriations Law 14-35 (3d ed. 2008) (citing, inter alia, opinions of the U.S. Attorney General finding that the compromising parties must have possessed a “bona fide dispute as to either a question of fact or of law”) (“GAO, Principles”). Further, “a compromise settlement which exceeds the authority of the official purporting to make it does not bind the government.” See id. at 14-34 (citing White v. U.S. Dep’t of Interior, 639 F.Supp. 82 (M.D. Pa. 1986), aff'd mem., 815 F.2d 697 (3d Cir. 1987); United States v. Irwin, 575 F.Supp. 405 (N.D. Tex. 1983)).
Cy pres distribution in class actions against the United States cannot satisfy these requirements. As part of settling Keepseagle, agents of the Executive agreed to send taxpayer money to as-yet unidentified “nonprofits” and “charities” that possess no claims against the United States. But the Judgment Fund Act and the settlements authority statute require the prompt payment of settled claims against the United States. The “nonprofits” and “charities” that will receive taxpayer money via cy pres are—more than five years since the settlement agreement’s entry[12]—unidentified. More fundamentally, they possess no claims against the United States.
As any potential cy pres recipient is neither involved in this litigation nor a party to the settlement agreement, the agreement settled no “bona fide dispute” between any potential cy pres recipient and the United States Government. Cy pres recipients will nevertheless receive access to the settlement fund, akin to being a “compromising party.”
In reality, the eventual cy pres recipients are being tasked by the Executive Branch and class counsel to fulfill a certain “purpose:” advocate for and assist Native American farmers and ranchers. But, as the U.S. Comptroller General has concluded, when a congressional appropriation limits an agency’s action to “remedying [a] *1075 violation,” it cannot use that appropriation “to carry out other statutory goals of the agency,” lest the agency “improperly augment its appropriations for those other purposes, in circumvention of the congressional appropriations process.” See Rep. to H. Rep. Subcomm. On Oversight and Investigations, B-247155, 1993 WL 798227 at *2 (Comp. Gen. Mar. 1, 1993); see also Availability of Judgment Fund in Cases Not Involving a Money Judgment Claim, 13 Op. O.L.C. 98, 104 (1989) (“[A]ny conclusion that would permit the Judgment Fund to pay out settlements in cases in which it would not pay out judgments would provide agencies with an incentive to urge settlement of cases in order to avoid payment from agency funds. We would not lightly attribute to Congress an intent to create a structure that might encourage settlements that would not otherwise be in the interest of the United States.”) [hereinafter Availability of Judgment Fund].
Congress intentionally separated Judgment Fund payments from agency appropriation payments. See, e.g., Vivian S. Chu & Brian T. Yeh, Cong. Research Serv., R42835, The Judgment Fund: History, Administration, and Common Usage 6 (2013) (“[T]he Judgment Fund is limited to litiga-tive awards, meaning awards that were or could have been made in a court. Litigative awards are distinguished from administrative awards because the latter are provided for by statute and are paid from an agency’s appropriation.” (emphasis added)). “Accordingly, settlements ... could be paid from the Judgment Fund if a judgment on that claim would have been paid from the Fund and no other source was mandated by law to pay such settlements.” Figley, The Judgment Fund, 18 U. Pa. J. Const. L. at 162-63 (emphasis added).[13]
A cy pres distribution is not an “award” the Keepseagle class claimants could have received by prevailing at trial. Had they proceeded to trial and prevailed on their claims for monetary damages, they would have received compensation for their damages. Cf. Augustin v. Jablonsky, 819 F.Supp.2d 153, 177 (E.D.N.Y. 2011) (noting the “general legal tenet that compensatory damages should do no more than compensate a victim for [his] injury”). This compensation is, by definition, a money judgment payable from the Judgment Fund. But, had the Keepseagle class claimants prevailed at trial, they could not, by definition, receive “cy pres damages”— payments that do not compensate them directly but fulfill a “purpose” “as near as possible” to compensating them. A cy pres distribution is thus not equivalent to a money judgment at trial. This renders the Judgment Fund Act appropriation unavailable for cy pres distributions. See Availability of Judgment Fund, 13 Op. O.L.C. at 98-99 (concluding “final judgments ... are payable from the Judgment Fund if they require the government to make direct payments of money to individuals, but not if they merely require the government to take actions that result in the expenditure of government funds” (emphasis added)); see also 31 U.S.C. § 1301(a) (“Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law”).
The arguments set forth by the Executive Branch and the Plaintiff-Appellees in *1076 response cite no supporting legal authority. The Executive Branch all but concedes cy pres distributions are not, themselves, compensation for claims against the United States—it just thinks that concern is “irrelevant.” See Gov’t Br. 21 (“Because all of the payments contemplated by the agreement are intended to settle the claims of class members, it is irrelevant whether an entity that might receive a distribution itself has a claim against the government.”). The Plaintiff-Appellee’s make a similar argument. See Plaintiff-Appellee Br. 47 (“There is no independent, additional requirement that each specific payment within that judgment must separately qualify under the Judgment Fund Act.”). My colleague apparently agrees. See Concurrence at 1058 (admitting “the nonprofit organizations that will receive cy pres distributions out of leftover settlement funds may not possess any claims against the United States,” while excusing this because “the Settlement Agreement did in fact settle claims against the United States”). These contentions have no basis in law.
On the Executive Branch’s reading, the Attorney General’s settlement authority allows him to make a mockery of Congress’s specific statutory limitations. For example, the Executive Branch could enter into a $1 billion settlement agreement fully aware only 1% of appropriated Judgment Fund dollars will be paid to class claimants, while 10% will go to class counsel and the remaining 89% will be distributed via cy pres. The Executive Branch, the reasoning would go, was not “legally required to have entered into a less generous agreement” simply because nearly all of the settlement fund will pay for something other than money damage claims against the United States. See Gov’t Br. 23. If class counsel’s “sophistication and effectiveness” can sweeten a settlement by letting the Executive use the settlement to further the Executive’s political goals instead of compensating class claimants, the sky is the limit. See id. We are nearly there in this case, where the majority of taxpayer dollars will not compensate class members but will pay cy pres recipients. This robs the Appropriations Clause of any force by undermining its presumption: Rather than expend public funds “only when authorized by Congress” in an express appropriation, “public funds” may be expended from the Judgment Fund “unless prohibited by Congress.” But see MacCollom, 426 U.S. at 321, 96 S.Ct. 2086 (plurality opinion). Such a view “increase[s] the power of the President beyond what the Framers envisioned, ... compromising] the political liberty of our citizens, liberty which the separation of powers seeks to secure.” Clinton, 524 U.S. at 452, 118 S.Ct. 2091 (Kennedy, J., concurring).
By binding the United States to these cy pres provisions, the Executive Branch arrogated the appropriation power from Congress to itself. See Richmond, 496 U.S. at 427-28, 110 S.Ct. 2465. The cy pres provisions of the parties’ settlement agreement therefore exceed the Executive Branch’s bargaining authority; they cannot bind the Government. See GAO, Principles, at 14-34; cf. Int’l Ass’n of Firefighters, 478 U.S. at 526, 106 S.Ct. 3063 (“[T]he fact that the parties have consented to the relief contained in a decree does not render their action immune from attack on the ground that it violates ... the Fourteenth Amendment.”); Settlements Limiting the Future Exercise of Executive Branch Discretion, 23 Op. O.LC. at 140 (concluding the Attorney General “may not enter into a decree that would require unconstitutional government action.... ”). Most relevant for our purposes, “Article III federal courts may not enforce unauthorized executive branch settlements.” See id. at 148. A court cannot effectuate this settlement’s cy pres provisions (ie., it cannot approve cy pres recipients or distri- *1077 buttons), nor can a court approve the addendum to the cy pres scheme at issue here—or any other addendum permitting cy pres recipients and distributions.

B.

Remedies Going Forward

The more than $380,000,000 remaining in this settlement fund should revert to the U.S. Treasury. This remedy respects Congress’s appropriations power, “corrects the parties’ mutual mistake” (if we want to call it that) “as to the amount required to satisfy the class members’ claims,” and it ensures the judiciary does not “effectuate transfers of funds from [the Government] beyond what [it] oive[s] to the parties in judgments or settlements.” See Klier, 658 F.3d at 482 (Jones, J., concurring). The Executive Branch concedes that this is the proper remedy. See Gov’t Br. 24. Mandan responds by saying “[t]here is no language in the Settlement Agreement to support a reverter[,] and courts have consistently rejected requests by defendants for reverter of residual settlement funds.” Plaintiff-Appellant Reply Br. 12. But none of Man-dan’s cited cases deal with cy pres’s constitutional infirmities in class actions against the United States Government.
Our Court does, and should, “decline[] to adopt [Appellant’s] suggestion to distribute unclaimed funds to those individuals who make claims; such a procedure would result in those class members receiving a windfall from the public fisc and is inconsistent with the general legal tenet that compensatory damages should do no more than compensate a victim for [his] injury.” Augustin, 819 F.Supp.2d at 177. But by affirming the district court’s approval of the cy pres addendum, the majority proves itself a faint-hearted friend of the public fisc. Even if this Court will not look after the People’s money, that does not mean the Justice Department—and Congress—lack means to do so. Cf. Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 661, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007) (Ginsburg, J., dissenting), su-perceded by statute, Lilly Ledbetter Fair Pay Act of 2009, Pub: L. No. 111-2, 123 Stat. 5 (“Once again, the ball is in Congresses] court. As in 1991, the Legislature may act to correct this Court’s parsimonious reading of Title VII.”).
Before the cy pres process begins, the Justice Department should consider a motion under Federal Rule of Civil Procedure 60(b)(4) to strike the cy pres provisions within the settlement agreement as void. No party has raised a Rule 60(b)(4) challenge in this case, and it is not subject to the finite time constraints restricting other Rule 60(b) motions. See Fed. R. Civ. P. 60(c)(1). This course could remove the cy pres provisions before recipients are approved and distributions begin. This should not affect the settlement agreement’s applicability between the class members and the United States—the class members have already been compensated, and the cy pres provisions may be severed from the rest of the agreement. See JA 438 (Original Settlement Agreement, XXVI. Severability). Indeed, the parties’ agreement prohibits any of its provisions from “imposing] on the Secretary [of Agriculture] any duty, obligation, or requirement” that “would be inconsistent with federal statutes or federal regulation in effect at the time of such performance.” See id. (Original Settlement Agreement, XXIII. Duties Consistent with Law and Regulations).
The Justice Department can argue, as explained above, that the Executive Branch lacked the constitutional and statutory authority to enter into these cy pres provisions. It cannot be required to continue to ask the judiciary to approve and police a cy pres distribution scheme that violates the Appropriations Clause and Ar- *1078 tide III limitations. As the Executive Branch said when contesting class counsel’s proposed attorney fee award in this case, “the government has an interest in ensuring ... that funds coming ultimately from federal coffers are not expended in an unnecessary or unreasonable manner.” Gov’t Resp. to Pis.’ Mot. for Att’y Fees and Expenses and to Pis.’ Mot. for Approval of Class Representative Incentive Awards at 2, Keepseagle v. Vilsack, No. 1:99-cv-03119 (D.D.C. Mar. 18, 2011), ECF No. 586. What was true then is true now. As objections rooted in the Constitution’s structural, jurisdictional limits on judicial power cannot be waived or consented to, and no cy pres process has occurred yet, objecting to the provisions before the Judicial Branch effectuates them is certainly “within a reasonable time” for purposes of Rule 60(b)(4). See Fed. R. Civ. P. 60(c)(1); Karsner v. Lothian, 532 F.3d 876, 886 (D.C. Cir. 2008) (explaining that, “before a judgment may be deemed void within the meaning of [Rule 60(b)(4) ], it must be determined that the rendering court was powerless to enter it”).
More broadly, the Justice Department should consider setting forth specific settlement guidelines disapproving the use of cy pres in class settlements with the United States. These guidelines could provide a prelude to congressional action.
As for Congress, it should consider amending the Judgment. Fund Act to explicitly bar cy pres distribution schemes in class action settlements with the United States. As Mandan points out, “the Executive Branch may not do indirectly what it is barred from doing directly.” Plaintiff-Appellant Opening Br. 29 (citing United States v. Bowman, 341 F.3d 1228, 1240 (11th Cir. 2003)). But this lawsuit reveals the degree to which implicit limitations on power are contingent upon the good faith of those exercising power. Cf. Clinton, 524 U.S. at 452-53, 118 S.Ct. 2091 (Kennedy, J., concurring) (“The Framers of the Constitution could not command statesmanship. They could simply provide structures from which it might emerge. The fact that these mechanisms, plus the proper functioning of the separation of powers itself, are not employed, or that they prove insufficient, cannot validate an otherwise unconstitutional device.”). Further, to ensure the Executive Branch is not letting political calculations supplant legal judgments at the taxpayer’s expense, Congress should also consider authorizing the Comptroller General to review and report to Congress oh any class action settlement in excess of $100 million.
III.
More than a century ago, Yale Professor William Graham Sumner famously discussed “The Forgotten Man.” See William Graham Sumner, The Forgotten Man, in The Forgotten Man and Other Essays 465 (Albert Galloway Keller ed., 1919). The Forgotten Man is the one left behind in the Government’s rush to “right” every perceived “wrong.” Sumner eloquently set forth the formula embraced by the social engineers of every age:
As soon as A observes something which seems to him to be wrong, from which X is suffering, A talks it over with B, and A and B then propose to get a law passed to remedy the evil and help X. Their law always proposes to determine what C shall do for X, or, in the better case, what A, B, and C shall do for X.
Id. at 466. “C,” of course, is “The Forgotten Man.” He is “the hidden taxpayer, the average citizen—not someone who received, rather someone who paid in.” Amity Shlaes, The Forgotten Man: A New History of the Great Depression 128 (2007). As Sumner says of “C,” “He works, he votes, generally he prays—but he always pays—-yes, above all, he pays.” Sum *1079 ner, The Forgotten Man, in The Forgotten Man and Other Essays 491 (Albert Galloway Keller ed., 1919).
Keepseagle is Sumner’s formulation come to life, and our decision today only entrenches the American People’s status as the Forgotten. The Executive Branch saw a wrong to correct—discrimination against Native-American farmers. It talked it over with' class counsel, eager to receive a big payday. They then worked together to ensure a vastly-overinflated settlement amount that would leave a huge sum to “remedy the evil” via cy pres. Lost in the midst of their self-congratulation is the plight of “C,” the American People that pay for the Executive Branch’s outsized misadventure and class counsel’s fee feast.
To the extent discrimination occurred against Native-American farmers by the Department of Agriculture, it was the Department of Agriculture, not the taxpayers of the United States, that engaged in discrimination. Those allegedly discriminated against have been compensated by the public físc, and that payment occurred via a process that—while ripe with politics and folly—was ultimately permitted by law. But, to the extent the Government would like to additionally account for this discrimination by funding nonprofits and charities that work to end discrimination against Native Americans, this should be the decision of the People and their elected representatives. It should not be the decision of Justice Department lawyers, class counsel, and the judiciary.
John Adams’s observation, “[o]ur Constitution was made only for a moral and religious People” and is “wholly inadequate to the government of any other,” is often quoted. See Letter from John Adams to Massachusetts Militia, 11 October 1798, Founders Online, National Archives, https://founders.archives.gov/documents/ Adams/99-02-02-3102. Few, however, explain what he meant. In the same passage, Adams admonished an America that “assume[d] the Language of Justice and moderation while it is practicing Iniquity and Extravagance.” Id. In such a nation, he warned, “Avarice, Ambition [and] Revenge or Galantry, would break the strongest Cords of our Constitution as a Whale goes through a Net.” Id. Jurist Thomas Cooley arrived at the same sentiment when he wrote a constitution cannot be completely understood by its words, but must also make reference to “that body of rules and maxims in accordance with which the powers of sovereignty are habitually exercised.” Thomas M. Cooley, A Treatise on the Constitutional Limitations which Rest Upon the Legislative Power of the States of the American Union 2 (1868). There are, in short, norms upon which self-government depends. The Constitution presumes them, but the character of our people determines whether we keep them. See The Federalist No. 1, at 27 (Clinton Rossiter ed., 1961) (A. Hamilton) (“[I]t seems to have been reserved to the people of this country, by their conduct and example, to decide the important question, whether societies of men are really capable or not of establishing good government from reflection and choice, or whether they are forever destined to depend for their political constitutions on accident and force.” (emphasis added)). The conduct of those in this case proves how little the Constitution will matter when good character ceases to be informed by adherence to one’s oath of office, and is primarily defined by how generous you are willing to be with someone else’s money.
I respectfully dissent.

. Even outside its cy pres provisions, the Keep-seagle settlement is generally less focused on compensating class members—and more focused on enacting agriculture policy and compensating class counsel—than the Pigford consent decree. See Carpenter, The USDA Discrimination Cases, 17 Drake J. Agric. L. at 25-26 & n.261 (explaining that, unlike Pigford, the Keepseagle settlement provides for "programmatic relief” that will: create a Federal Advisory Committee called the Council for Native American Farming and Ranching; create sub-offices within the Agriculture Department on Indian Reservations; provide for a review of loan making within the Agriculture. Department in consultation with class counsel; require the Agriculture Department to collect data regarding Native American farming loans to identify disparities; and create an Ombudsman that will address concerns of "socially disadvantaged” farmers and raise them with the Council. Class counsel also received a bigger benefit in Keepseagle—the settlement allows class counsel’s fee award to come from a percentage of the common settlement fund, rather than a flat fee credited against the class award). These arrangements gave class counsel an incentive to inflate the class claimants' damages, while incentivizing the Executive Branch to drop its strong legal arguments and settle in favor of enacting agriculture policy.

. The dearth of class claimants that actually qualified to receive money damages confirms the inflation. As the Executive Branch acknowledges here, “[t]he claims process ... allowed claimants to obtain substantial recoveries by submitting minimal evidence.” Gov’t Br. 27 (emphasis added). All that was required to "obtain $50,000 plus $12,500 in tax relief [under Track A]” was "a written statement without any further supporting documentation (save proof of Tribal membership, if applicable).” Id. at 27-28. Under Track B, a claimant could "obtain a cash payment of up to $250,000 by meeting a ‘preponderance of the evidence' standard in an entirely non-adversarial process (meaning that any showing of discrimination went unrebutted even if the government could have rebutted the claim had it proceeded to litigation).”' Id. at 28. Moreover, the Agriculture Department forgave any outstanding federal farm loan debt for any claimant that prevailed under either Track A or Track B, even if "the value of that debt relief far exceeded claimants' cash recoveries.” Id. Short of giving the settlement money away without any process at all, it is difficult to see how the Executive Branch could have made it any easier for class members to collect. Nevertheless, only 3,601 individuals prevailed in this process—a sliver of the more than 19,000 claimants predicted by the class complaint. See Fifth Amended Class Action Complaint at 163 ¶ 143, Keepseagle v. Vilsack, No. 1:99-CV-03119, 2001 WL 35985330 (D.D.C. June 27, 2001).

. Even the Executive Branch could not, initially, swallow the size of class counsel’s fee award. In contesting this award, the Executive Branch acknowledged it was willing to pay attorney fees that roughly doubled its estimate of class counsel’s actual expenses to settle the case, but it was not comfortable paying what class counsel ultimately received. See, e.g., Gov’t Resp. to Pis.’ Mot. for Att’y Fees and Expenses and to Pis.’ Mot. for Approval of Class Representative Incentive Awards at 2, 7, Keepseagle v. Vilsack, No. 1:99-cv-03119 (D.D.C. Mar. 18, 2011), ECF No. 586; see id. at 9 ("It is possible that Plaintiffs’ billing records provide adequate support for the claimed expenditures, but it is difficult to imagine, for example, how money spent on ‘conferences’ or ‘media services' is a reasonable and necessary litigation expense at that time, and none of the travel expenses are justified or described beyond ‘travel.’ ”).

. Moreover, the insistence that we must be willfully blind to context unless it is "test[ed] in the crucible of cross-examination” is especially puzzling. Concurrence at 1056. The context of this case is not examined to make a factual determination—it helps explain why "exceptional circumstances” exist to address Mandan’s constitutional arguments. It makes no sense to insist on a trial when, by design, "exceptional circumstances” are only invoked on appeal to consider an argument not raised below.

. Mandan does not detail the Appropriations Clause's implications for judicial power to the same extent he does for cy pres distributions under the Judgment Fund Act. Still, Mandan does fully brief the implications of cy pres distributions for the separation of legislative, judicial, and executive powers. See, e.g., Appellant Opening Br. 22-29. We are thus well within our purview to detail the particular implications for judicial power. See Kamen v. Kemper Fin. Servs., 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.”); Carducci v. Regan, 714 F.2d 171, 177 (D.C. Cir. 1983) (clarifying a panel is "not precluded from supplementing the contentions of counsel through [its] own deliberation[s] and research” (emphasis added)).

. The concurrence dismisses the cases saying structural, jurisdictional limitations on Article III are always before us, because those cases "involv[e] forfeiture—not waiver.” Concurrence at 1057. The concurrence says “[t]he Supreme Court ... has been clear” on the difference between the two concepts. See id. I beg to differ. See Freytag, 501 U.S. at 894 n.2, 111 S.Ct. 2631 (Scalia, J., concurring in part and concurring in the judgment, joined by O'Connor, Kennedy, & Souter, JJ.) ("[0]ur cases have so often used them interchangeably that it may be too late to introduce precision.... I shall try not to retain the distinction between waiver and forfeiture throughout this opinion, since many of the sources I shall be using disregard it.”). What is clear, however, is the Supreme Court’s admonition in Schor: constitutional limits on Article III are not to dangle at the mercy of artfully parsed relinquishment concepts. See 478 U.S. at 850-51, 106 S.Ct. 3245 ("notions of consent and waiver cannot be dispositive” if Article III limitations are at issue (emphasis added)).

. This reality of aligned interest bespeaks a broader problem of collusion within class actions—often at the expense of individual class members. See Mayer Brown, Do Class Actions Benefit Class Members? An Empirical Analysis of Class Actions 9 (2013), https://www. mayerbrown.com/files/uploads/Documents/ PDFs/2013/December/DoClassActionsBenefit ClassMembers.pdf ("Cy pres awards and in-junctive relief serve primarily to inflate attorney’s fee awards—and benefit third parties with little or no ties to the putative class.”); see also Amchem Prods. v. Windsor, 521 U.S. 591, 614, 617-18, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (describing the class action device as "adventuresome” and fraught with questions of proper judicial administration). The class action device is supposed to be nothing more than a mere “species” of joinder. See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 408, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010). When class actions attempt to circumvent the underlying substantive law, the device has gone beyond its strictures. See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 367, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) ("[T]he Rules Enabling Act forbids interpreting Rule 23 to abridge, enlarge, or modify any substantive right....”). By breaking the bonds- of a case or controversy, cy pres in a class action against the United States comes at the expense of the underlying substantive law meant to restrict Government action: Our Constitution.

. The circumstances in which Congress has compensated victims are legion and varied. See, e.g., 12 U.S.C. § 5219a (Home Affordable Modification Program, created by the Emergency Economic Stabilization Act of 2008 in response to the subprime mortgage crisis); 15 U.S.C. § 7246(a) (creating the “Fair Fund” established by the Sarbanes-Oxley Act of 2002 to distribute disgorgement penalties to defrauded investors); 49 U.S.C. § 40101 (creating the September 11th Victim Compensation Fund).

. Reversion to the Treasury is also distinct from escheating to the state, another alternative to cy pres distributions. Certain requirements must be met for monies deposited with the judiciary to escheat to the United States. See 28 U.S.C. § 2041. The issue here, however, is not that the settlement fund’s remainder is unable to compensate a claimant for some reason. Cf. id. ("This section shall not prevent the delivery of any such money to the rightful owners upon security, according to agreement of parties, under the direction of the court.” (emphasis added)). Rather, the "rightful owners,” the class claimants, have already received what they rightfully own (their respective awards for compensatory damages), and Congress appropriated money for no other expenditure. The only other "rightful owners” are the American taxpayers, who own the remainder pending a decision by their elected representatives to additionally appropriate the remaining money.

. These problems are compounded by the "appearance of impropriety” created by "the specter of judges and outside entities dealing in the distribution and solicitation of large sums of money.” SEC v. Bear, Stearns & Co., 626 F.Supp.2d 402, 415 (S.D.N.Y. 2009). As numerous press reports and cases indicate, cy pres distributions are littered with ethical issues. See, e.g., Richard A. Epstein, Editorial, The Deferred Prosecution Racket, Wall St. J. (Nov. 28, 2006, 12:01 AM), https://www.wsj. com/articles/SB 116468395737834160 (criticizing a Bush administration settlement with Bristol-Myers Squibb that required the company’s endowment of a—hold on to your hat—chair of ethics at Seton Hall Law School, the alma mater of the then-U.S. Attorney for the District of New Jersey); Editorial, Holder Cut Left-Wing Groups in on $17 Bil BofA Deal, Investor's Business Daily (Aug. 27, 2014), http://www.investors.com/politics/ editorials/holders-bank-ofamerica-settlement-includes-payoffs-to-democrat-groups/ (criticizing a Justice Department settlement with Bank of America as a "raft of political payoffs to Obama constituency groups”); Adam Lip-tak, Doling Out Other People’s Money, N.Y. *1072 Times (Nov. 26, 2007), http://www.nytimes. com/2007/1 l/26/washington/26bar.html.

. For these reasons, it is inapposite to conclude that invoicing waiver prevents Mandan from “sandbagging” either the Executive Branch or the district court. The rule of law is undermined if "sandbagging” includes a party raising constitutional problems that the Executive Branch and the district court were obliged to consider in the first instance.

. Delay results in a further perversion of the Judgment Fund Act. Interest accrued on the remaining amount in the settlement fund will be subject to cy pres distribution too. As of October 2014, more than $2.5 million in accrued interest was available for cy pres distribution. See JA 881-82. The longer it takes to "select” cy pres recipients, the more interest will accrue, and the more money will pass through cy pres distribution. Compensating class claims is truly ancillary to such a scheme.

. In attempting to turn what a "claim” is into a factual dispute, the concurrence looks for shadows where there are none. See Concurrence at 1058 ("What Eire 'like causes’ to this one? And how are judgments in such cases settled and paid?”). Whether one has stated a claim can be subject to factual argument, but what a "claim” is—or, if you prefer, what a "cause” of action is—and what kind of relief a claim is capable of yielding, rests on the law.